Ekwan E. Rhow - State Bar No. 174604
    eer@birdmarella.com
Timothy B. Yoo - State Bar No. 254332
    tby@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
CJ E&M America, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DFSB KOLLECTIVE CO. LTD.,<br><br>        Plaintiff,<br><br>    vs.<br><br>CJ E&M, INC., a Korean corporation;<br>CJ E&M AMERICA, INC., a California corporation,<br><br>        Defendants. | CASE NO: 2:15-cv-01650-SVW-FFM<br><br>**DEFENDANT CJ E&M AMERICA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR *FORUM NON CONVENIENS*, LACK OF STANDING, AND FAILURE TO STATE A CLAIM FOR RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**FED. R. CIV. P. 12(b)(1) and 12(b)(6)**<br><br><br>Date:    June 1, 2015<br>Time:    1:30 P.M.<br>Crtrm.: 6<br><br>Assigned to Hon. Stephen V. Wilson |

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    INTRODUCTION .......................................................................................... 1

II.   ARGUMENT ................................................................................................ 6

   A.   This Court Can And Should Dismiss This Action Based On
        *Forum Non Conveniens*. ...................................................................... 6

        1.   Plaintiff concedes that Korea is an available and adequate
             forum. .......................................................................................... 6

        2.   It is far more convenient for the parties to litigate this
             dispute in Korea. ........................................................................ 7

             a.   The Residence Of The Parties And Witnesses
                  Favors Dismissal. ............................................................ 8

             b.   The Relevant Documents Are Located In Korea
                  And Written in Korean. .................................................. 11

             c.   Evidence From Third Parties Is More Easily
                  Obtained In Korea. ......................................................... 13

        3.   The Court should dismiss this action in the interest of
             judicial economy and the public's convenience. ...................... 16

             a.   A Court Would Have To Apply Predominantly
                  Korean Law. .................................................................... 16

             b.   There Is No Local Interest In Resolving This Case
                  Before This Court ............................................................ 19

             c.   It Would Be A Waste Of Judicial Resources To Try
                  This Case Here. ............................................................... 19

        4.   This motion should be granted based on *forum non
             conveniens* ................................................................................ 20

   B.   Plaintiff Has Failed To State A Claim For Relief. ............................... 20

        1.   Plaintiff has failed to state a claim for copyright
             infringement. ............................................................................. 20

        2.   Plaintiff has failed to state a claim for violations of the
             DMCA. ....................................................................................... 21

   C.   Plaintiff Lacks Standing To Sue. ......................................................... 22

        1.   Facial Attack. ............................................................................. 22

2.  Factual Attack. ................................................................. 23

III.  CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ................................................................. 11

*Allstate Life Ins. Co. v. Linter Group Ltd.*,
994 F.2d 996 (2d Cir. 1993) ................................................................... 15

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) ............................................................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 20

*Cheng v. Boeing Co.*,
708 F.2d 1406 (9th Cir. 1983) ................................................................. 6

*Creative Technology, Ltd. v. Aztech Systems PTE*,
61 F.3d 696 (9th Cir. 1995) ................................................................... 19

*Howe v. Goldcorp Invest. Ltd.*,
946 F.2d 944 (1st Cir. 1991) ................................................................. 15

*Lahiri v. Universal Music & Video Dist.*,
513 F. Supp. 2d 1172 (C.D. Cal. 2007) ........................................... 5, 16

*Lockman Found. v. Evangelical Alliance Mission*,
930 F.2d 764 (9th Cir. 1991) ................................................................... 6

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ............................................... 6, 7, 8, 16

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*,
24 F.3d 1368 (Fed. Cir. 1994) ............................................................... 13

*Nat'l Union Fire Ins. Co. v. Allfirst Bank*,
282 F. Supp. 2d 339 (D. Md. 2003) ....................................................... 22

*Perfect 10 v. Google, Inc.*,
416 F. Supp. 2d 828 (C.D. Cal. 2006) ................................................... 21

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981) ............................................................................ 6, 7

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
   329 F.3d 64 (2d Cir. 2003) ...................................................................... 7

*In re: Proceedings Before the Korean District Court in the Republic of
   Korea*,
   No. 02-2097 (W.D. Wash. Nov. 1, 2002), ECF No. 13 ....................... 14

*Silvers v. Sony Pictures Entm't, Inc.*,
   402 F.3d 881 (9th Cir. 2005) ............................................................... 23

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
   24 F.3d 1088 (9th Cir. 1994) ............................................................... 17

*Textile Secrets Int'l, Inc. v. Ya-ya Brand, Inc.*,
   524 F. Supp. 2d 1184 (C.D. Cal. 2007) ............................................... 22

**Federal Statutes**

17 U.S.C. § 501(b) ....................................................................................... 23

Digital Millennium Copyright Act ........................................................ 21, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiff has failed to refute Defendant CJ E&M America, Inc.'s clear showing that litigating this matter in a Korean court would be more convenient than in this forum.  This is a Korean property dispute between two Korean companies over who owns what rights.  That those property rights involve overseas distribution rights is incidental to the key issue—ownership—and does not countervail the enormous inconvenience that the parties and the Court would bear in resolving that issue here.

Despite DFSB's attempts at misdirection, the fact remains that its present lawsuit is largely indistinguishable from a prior Korean litigation (the "2011 Korean litigation"), in which it asserted nearly identical claims.  In trying to point out a supposed "misrepresentation" by CJ E&M America, DFSB steps on a rake by stating:

- "In contrast to this case, DFSB did not claim in the Korean dispute to have exclusive distribution rights to any of the music at issue."  (Opp. at 2.)

- "In that dispute (in contrast to the case now pending in this Court), DFSB did not claim to have exclusive distribution rights to the music, and there was no allegation of copyright infringement against CJ E&M."  (Declaration of Bernie Cho ("Cho Decl.") ¶ 3.)

But DFSB's pointed assertions are undercut by its very own evidence.  To wit, the Settlement Order in the 2011 Korean litigation, references a "List of Claims" contained in the Purport and Reason for the Claim.  (Cho Decl., Exh. 1 at 2.)  In the corresponding Reason for the Claim, Paragraph 3 is entitled "Illegal overseas distribution of digital music content by defendant" and contains DFSB's prior allegations:

Defendant allows overseas users using overseas IP to illegally stream and download 3947 songs distributed overseas by the plaintiff . . . ***from the sites www.mnet.com*** and music.naver.com operated by the defendant.

. . .

Furthermore, despite the fact that ISRC code must be issued in order to distribute digital music content overseas, defendant illegally distributed the content without even receiving the ISRC code from the plaintiff, who manages and issues domestic ISRC code.

. . .

**This is illegal breach of plaintiff's overseas distribution rights** . . . ."

(Cho Decl., Exh. 1 at 10-11 (emphases added).)

These are the *same assertions* made in Plaintiff's present complaint for which it now brings a cause of action for copyright infringement. As stated in Defendant's opening brief, "[w]hile the Korean court in that action entered a final judgment as to two discrete issues, Plaintiff covenanted as part of a concurrent settlement agreement not to sue CJ E&M for civil damages again based on any claims it had asserted . . . ." (Mem. at 5.) This is corroborated by Plaintiff's evidence: "Plaintiff shall withdraw **remaining claims** and both plaintiff and defendant shall not submit any other civil claims such as compensation for damages etc. in relation to the agreement of this case." (Cho Decl., Exh. 1 at 2 (emphasis added).) These claims were litigated in the Korean court and, if brought again by Plaintiff, should be litigated there once again.

Desperate to amplify its lawsuit's attenuated ties to this forum and manufacture out of whole cloth others, DFSB also grossly overstates two things: (i) CJ E&M America's supposed close involvement with the alleged bad acts; and (ii) the role that American third-parties Beats Music and MediaNet will play in resolving the dispute. This Court should not be led askance by Plaintiff's meaningless hand waving.

*First*, CJ E&M America is not involved in any of the acts alleged in Plaintiff's complaint. In support of its motion, CJ E&M America submitted a witness declaration asserting the following:

- "Nobody at CJ E&M America is involved in licensing sound

recordings or the underlying music content for Korean pop music."

- "[N]obody at CJ E&M America was involved in the negotiation or execution of any content distribution agreement with Beats Music or any other streaming music service."

- "[N]obody at CJ E&M America is responsible for licensing music to or providing music content to Beats Music or any other streaming music service."

- "Nobody at CJ E&M America is involved in the back-end or front-end administration of the so-called 'Mnet' website . . . ."

- "Nobody at CJ E&M America controls the content that is displayed on or available through the 'Mnet' website."

(Killoren Decl. ¶¶ 5,7.)[1]  Nothing in Plaintiff's opposition and supporting declarations refutes any of those factual assertions.

Foremost, its bald assertion that "publicly available information indicates that CJ E&M America was closely involved with the distribution of sound recordings to the U.S. public," (Opp. at 1), is a falsehood.  For instance, DFSB tries to tie the website MnetAmerica.com to the alleged wrongdoing by asserting that "[o]nline fan sites and community sites" supposedly instruct users how to circumvent the security protocols in place so that users can "obtain Korean pop music through the website of www.mnetamerica.com."  (Cho Decl. ¶ 7.)  As support, DFSB submits a screenshot of a post dated *October 27, 2010* from one of these third-party "fan sites."  (Cho Decl., Exh. 7.)  The time-barred nature of this fact aside, the www.mnetamerica.com website is entirely distinct and separate from the "Mnet" website identified in the complaint – as it is not used to download music and has no connection to the "Mnet" website at issue.  Such superficially-relevant assertions underscore the overall speciousness of DFSB's claims and highlight fatal defects in its theory of liability.

Likewise, while Plaintiff makes much ado about CJ E&M America's

---

[1]   This evidence was not submitted, as Plaintiff contends, to rebut liability.  Rather, it was presented for purposes of the *forum non conveniens* analysis, which is not based on the merits of the case, to demonstrate that the locus of the dispute is in Korea.

3

promotion of KCON, (Opp. at 4), an annual convention showcasing all aspects of Korean popular culture, including Korean popular music ("K-pop") but also Korean cuisine, movies, and television, it cannot connect the dots to the wrongdoing alleged in the complaint.  Indeed, CJ E&M America does not deny that it is heavily involved in promoting Korean popular culture.  (*See, e.g.*, Killoren Decl. ¶ 6.)  That is the core of the company's business, and indeed, its mission statement.  But it does not license K-pop, to Beats Music or anyone else, nor does it administer the "Mnet" website, the alleged acts upon which the entirety of Plaintiff's claims is based. (Killoren Decl. ¶¶ 4, 5, 7.)  Nothing in Plaintiff's opposition or supporting declarations suggest otherwise.

*Second*, evidence from the American third-parties, Beats Music and MediaNet, has only scant relevance to the key issues in this action.  As a threshold matter, while Plaintiff rests its claims on the alleged distribution of sound recordings on Beats Music and the "Mnet" website, it identifies only 19 out of the 303 sound recordings listed in its complaint (roughly 6%) as having been provided to Beats Music.  (Compl. ¶ 25.)  The bulk of the allegedly infringing activity therefore concerns the "Mnet" website housed in Korea, not Beats Music.  (Compl. ¶¶ 30-38.) In other words, quantitatively, Plaintiff's allegations are almost entirely directed at the alleged overseas distribution of music by CJ E&M Corporation through the "Mnet" website.

Indeed, CJ E&M Corporation is not likely to dispute that it provides music to Beats Music.  It signed a content distribution agreement with Beats Music in January 2014 to do just that.  (Lee Decl. ¶ 8.)  Hence, the critical issue as it relates to that 6% of the asserted sound recordings is not whether and in what manner (e.g., via MediaNet) they were provided to Beats Music.  Rather, it is *who owns* the overseas distribution rights to those recordings.  CJ E&M Corporation provides to Beats Music only sound recordings to which it owns the overseas distribution rights. (Mem. at 10.)  DFSB claims otherwise.  Therefore, for music provided to Beats

Music, the dispositive issue will be the ownership of the underlying copyrights, and who was assigned or granted what rights, which must be decided under Korean law. *See Lahiri v. Universal Music & Video Dist.*, 513 F. Supp. 2d 1172, 1176 n.4 (C.D. Cal. 2007).

For the sound recordings not alleged to have been provided to Beats Music, i.e., virtually all of the 303 recordings listed in its complaint, Plaintiff alleges that those were made available for overseas consumers through the "Mnet" website. (Compl. ¶¶ 30-38.)  All of the music content on that website is curated entirely and exclusively by a team in Korea, who handles among other things the licensing and acquisition of all K-pop content.  (Mem. at 10-11; Lee Decl. ¶ 11.)  Thus, all of the witnesses relating to the music distributed on the "Mnet" website are in Korea.  (Lee Decl. ¶ 11.)

Moreover, a gateway issue to liability in this action is that music content is not available when the "Mnet" website is accessed from overseas.  (Mem. at 10-11; Killoren Decl. 8.)  Since Plaintiff can then at best only proceed on a secondary theory of liability, the key issues will then be (i) whether CJ E&M Corporation had the right and ability to supervise the third-party circumvention and (ii) whether it specifically knew of the circumvention and either induced, caused, or materially contributed to it.  That will require, among other things, evidence from the administrators of the "Mnet" website, namely the online division, about the level of control or knowledge that they had of any allegedly infringing third-party activity, and what they did, if anything, to curb or stop it, such as putting geo-blocking protocols in place.  That team resides in Korea at CJ E&M Corporation's headquarters.  (Lee Decl. ¶ 11.)

Because of Plaintiff's failure to rebut Defendant's clear showing that the inconvenience to the parties and Court favors dismissal, this Court should dismiss this action in its entirety so that it can be refiled in Plaintiff's home forum, a Korean court, where the matter can be most conveniently resolved.

Alternatively, this Court should dismiss this action because Plaintiff lacks standing and has failed to plead claims for which it can be granted relief.  Notably, while Plaintiff's evidence fails to rebut any of the assertions in Defendant's opening brief, Plaintiff has helpfully submitted to this Court unrefuted evidence that it indeed lacks standing to sue.  Since district courts have an independent obligation to determine that the parties before them have standing, this Court can and must consider this evidence and thereafter dismiss Plaintiff's lawsuit on that basis.

For those reasons, and for all the reasons set forth in Defendant's opening brief, this Court should dismiss this action for *forum non conveniens*, and in the alternative, because Plaintiff lacks standing to sue and in any event has failed to state a claim for which it can be granted relief.

## II.   ARGUMENT

### A.   This Court Can And Should Dismiss This Action Based On *Forum Non Conveniens*.

#### 1.   Plaintiff concedes that Korea is an available and adequate forum.

Plaintiff concedes as it must that a Korean court provides adequate remedies and permits suits involving the subject matter of the dispute.  (Opp. at 3.)  Further, Defendants are all amenable to suit in Korea.  (Mem. at 7-8.)  Korea is therefore an adequate alternative forum.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256-57 (1981); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001).

The analysis then turns on whether the balancing of the private and public interest factors outweigh plaintiff's choice of forum and points toward dismissal in favor of the Korean forum.  *Cheng v. Boeing Co.*, 708 F.2d 1406, 1409 (9th Cir. 1983); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991) (If "the balance of conveniences suggests that trial in the chose forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper.") (citation omitted).

Plaintiff further concedes that, as a foreign party, its choice of a U.S. forum is

6

entitled to less deference.  (Opp. at 2.)  The attendant showing that Defendant must make on the convenience factors, then, is also much less.  *Piper Aircraft*, 454 U.S. at 256.  This is because when a foreign plaintiff chooses to sue in the U.S., "such choice is entitled to less deference because one may not easily presume that choice is convenient."  *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003)  "In such circumstances, it is more likely that forum-shopping for a higher damage award or for some other litigation advantage was the motivation for plaintiff's selection.  Even absent those forum shopping considerations, there still is no reason to assume a U.S. forum is convenient for a foreign plaintiff's suit."  *Id.*

As stated in Defendant's opening brief, DFSB made a transparent tactical choice to vex Defendants with oppressive logistical burdens and the specter of hefty statutory damages in order to leverage that nuisance value into what it hoped would be a quick settlement and payday.  (Mem. at 1.)  This is precisely the scenario that the doctrine of *forum non conveniens* is meant to militate against.  See, e.g., Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947) (judiciary has inherent authority to decline jurisdiction in instances in which plaintiffs "seek not simply justice but perhaps justice blended with some harassment").

### 2. It is far more convenient for the parties to litigate this dispute in Korea.

The private interest factors that courts consider when weighing the convenience of the parties include: (i) the residence of the parties and the witnesses; (ii) the forum's convenience to the litigants; (iii) access to the physical evidence and other sources of proof; (iv) whether unwilling witnesses can be compelled to testify; (v) the cost of bringing witnesses to trial; (vi) the enforceability of the judgment; and "all other practical problems that make trial of a case easy, expeditious and inexpensive."  *See Lueck*, 236 F.3d at 1145-46.  As courts have applied them, these are gestalt factors and the "district court should look to any or all of the above factors which are relevant to the case before it, giving appropriate weight to each."

1   *Id.* (citations omitted).  This Court should therefore "consider them together in

2   arriving at a balanced conclusion."  *Id.*

3         **a.      The Residence Of The Parties And Witnesses Favors Dismissal.**

4

5         The essential parties and the relevant party witnesses all reside in Korea.  As

6   set forth in Defendant's opening brief and explained in detail above, Defendant CJ

7   E&M Corporation ("CJ E&M") and all of its witnesses reside in Korea.  While CJ

8   E&M America resides in the U.S., it is not involved in music licensing or the

9   administration of the "Mnet" website.  (Killoren Decl. ¶¶ 4, 5, 7.)  Plaintiff DFSB

10  resides in Korea.  (Comp. ¶ 6) ("DFSB Kollective Co. Ltd. is a corporation under

11  the laws of the Republic of Korea with its principal place of business in Seoul,

12  Korea.")  This is therefore a dispute between two Korean companies regarding the

13  overseas rights to Korean property, which favors a Korean forum.  DFSB's

14  seemingly straight-faced argument that "two out of three of the litigants have no

15  reasonable objection to the convenience of" the present forum, (Opp. at 8), is as

16  farcical as saying Tommie Aaron was one half of the most prolific home-run-hitting

17  sibling duo in baseball history.[2]  While the latter statement is technically true, like

18  Plaintiff's flawed argument, it totally ignores the appropriate quantitative weight

19  that should be given to the parties involved.  Here, all of the salient fact witnesses

20  belong to CJ E&M, (Lee Decl. ¶¶ 3, 8, 11), and the locus of the dispute is plainly in

21  Korea.

22        For instance, in its complaint, Plaintiff alleges wrongdoing on two fronts: (i)

23  for sound recordings provided to Beats Music, (Compl. ¶¶ 2, 24-27), and (ii) sound

24  recordings distributed on the "Mnet" website (Compl. ¶¶ 30-38).  The former is

25  handled entirely by the music distribution department, of which Dong-hun Lee is the

26  Team Leader, at CJ E&M Corporation in Korea.  (Lee Decl. ¶¶ 3, 8-10.)  For the

27  _____

28  [2]   *Tommie Lee Aaron*, http://en.wikipedia.org/wiki/Tommie_Aaron.

latter, Dong-hun Lee's team curates all of the music available on the "Mnet" website while another team, the online team, administers all technical aspects of the website, including putting in place protocols to ensure compliance with any territorial restrictions on the distribution of music.  (Lee Decl. ¶ 11.)  Thus, to the extent that evidence must be obtained regarding the "Mnet" website, it must be obtained from Korea.  This includes evidence identified by Plaintiff regarding:

- "The English-language user agreement for Mnet.com directed to U.S. consumers."

- "English-language, online commercials for Mnet.com directed to U.S. consumers."

- "English-language online, credit-card submission forms for Mnet.com, which accepts American credit cards."

(Opp. at 8.)  In other words, to recap, (i) all of the witnesses concerning the provision of sound recordings to Beats Music are in Korea; and (ii) all of the witnesses concerning the music content available on the "Mnet" website, i.e., the bulk of the allegations in Plaintiff's complaint (since it otherwise identifies only 19 sound recordings provided to Beats Music), including witnesses that would be knowledgeable about the evidence that Plaintiff claims is important to resolving the current dispute, (Opp. at 8), are located in Korea.  On that factor alone, a trial would be more convenient in Korea than before this Court.

The cost of bringing some or all of those witnesses to a trial in the U.S. further favors dismissal.  Given the respective locations of salient witnesses, Plaintiff's claim that "trans-Pacific travel is inevitable" in this case (Opp. at 11) is disingenuous, since a trial in Korea would obviate the need for most if not all of that travel, while a trial in the U.S. would almost ensure it.

Again, Plaintiff grossly overstates and misstates CJ E&M America's involvement in the activities contained in complaint's allegations by offering multiple irrelevant red herrings.  Plaintiff is correct that CJ E&M America, along with Defendant CJ E&M Corporation, does help organize KCON, an annual

convention showcasing of all things relating to Korean popular culture.  (Opp. at 4.)  One of the event's highlights is a live taping of "M Countdown," a weekly cable broadcast show that is indeed the "World No.1 K.Pop Chart Show."  *Id.*  What is not clear, however, is what nexus any of that has to the wrongdoing alleged, i.e., the alleged provision of music to Beats Music and overseas distribution through the "Mnet" website.  Indeed, since "M Countdown" is as the name suggests a weekly countdown show of the most popular trending acts in K-pop, it features, well, *popular* Korean music.  For example, the headline acts of KCON in 2014 were G-Dragon, who has been featured multiple times in Billboard magazine, and Girls' Generation, one of the most popular musical acts in all of Asia.[3]  By contrast, the sound recordings Plaintiff asserts are many years old and were predominantly recorded by indie-bands or by groups who, charitably, have long eclipsed their hey-day.  Indeed, these songs are about as close to being featured on "M Countdown" as Tommie Aaron is to joining his brother Hank in Cooperstown.

Further, CJ E&M America readily admits to promoting Korean popular culture in the U.S.  That is precisely the business that it is in.  In fact, its witness already declared that "CJ E&M America sporadically promoted the Beats Music service on its SNS during 2014."  (Killoren Decl. ¶ 6.)  Plaintiff fails to point out what, exactly, is inaccurate about that assertion.  (Opp. at 4-5.)  Again, promoting Korean popular culture is not equivalent to (i) providing sound recordings to Beats Music, nor (ii) making music content available on the "Mnet" website.

Finally, Plaintiff's tortured attempt to connect CJ E&M America to the wrongdoing through www.mnetamerica.com fares no better.  Plaintiff touts in its opposition that "CJ E&M administers a website, MnetAmerica.com, from Los Angeles."  (Opp. at 4.)  Plaintiff rests its entire argument on a single screenshot of a

---

[3]   Jeff Benjamin, "KCON More than Doubles Attendance in 2014," Billboard.com, August 12, 2014, http://www.billboard.com/articles/columns/k-town/6214466/kcon-2014-more-than-doubles-its-attendance.

post dated October 27, 2010 from a third-party "fan site" that supposedly instructs users how to purchase music through www.mnetamerica.com.  (Cho Decl., Exh. 7.) Even if for the sake of argument it was possible to circumvent the "Mnet" website's geo-blocking protocol through www.mnetamerica.com in October 2010, statute of limitations aside, secondary liability can hardly attach for such acts of apparent third-party infringers unrelated to CJ E&M America, i.e., the online fan sites and community sites that supposedly instructed users how to trick the "Mnet" website. As a threshold to proving liability, Plaintiff would have to show that CJ E&M America at the time either (i) had the right and ability to supervise the allegedly infringing activity and benefitted financially from it or (ii) that it specifically knew of the infringement and either induced, caused, or materially contributed to it.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019-22 (9th Cir. 2001). Recognizing that it cannot make either showing, Plaintiff elected not to include a single allegation regarding www.mnetamerica.com in its complaint, which claims would have been time-barred in any event.  Its belated feeble attempt in its opposition to tether CJ E&M America to the complaint's allegations by way of www.mnetamerica.com is unavailing and more critically fails to refute any of CJ E&M America's assertions about its non-involvement.

Thus, the residence of the parties and witnesses that are relevant to this action favor dismissal in favor of a Korean forum.

### b.    The Relevant Documents Are Located In Korea And Written in Korean.

Plaintiff contends that the "evidence in this case will primarily consist of documents."  (Opp. at 8.)  Where Plaintiff errs, however, is describing the nature and scope of the extant documents.  As emphasized earlier, the key issue in resolving this dispute will be determining the ownership of the underlying copyrights.  This could involve tracking down and verifying the chains of title for each one of the 303 sound recordings asserted in Plaintiff's complaint.  (*See* Mem.

1   at 10 ("For music content that it distributes, CJ E&M either owns the rights directly

2   or acquires the necessary distribution rights via licenses from third-party content

3   providers[.]").)

4        Licenses from third-party content providers sometimes but not always include

5   chain-of-title documents stemming all the way back to the underlying agreements

6   with the original copyright holders.  (*See, e.g.*, Lee Decl. ¶ 10.)  Because the sound

7   recordings at issue here are quite old, there could and very likely have been multiple

8   licenses with varying grants of rights during the intervening years.  *Id.*  By way of

9   example, CJ E&M Corporation acquired the rights to "Get on the Bus" by

10  Rhymebus through a licensing agreement with third-party content provider Neowiz

11  Internet.  (Lee Decl. ¶ 10.)  But since Neowiz is a sub-licensor, to confirm

12  ownership the chain-of-title would properly have to be verified all the way back to a

13  grant of rights by the original rights holder, Buddha Records in this instance.  *Id.*

14       Again, since the central issue here is ownership, it will be important to

15  marshal all of the ownership documents for each of the 303 sound recordings at

16  issue.  While Plaintiff has helpfully translated the chain-of-title documents for the

17  19 tracks that it alleges were provided to Beats Music, there are 284 other sound

18  recordings at issue.  Those documents all remain in Korea, and not necessarily in the

19  possession or control of the parties.  (Mem. at 11.)

20       As discussed *infra*, documents relating to the administration of the "Mnet"

21  website, including all internal communications written in Korean possibly

22  evidencing or disproving a level of control and encouragement to the potentially

23  infringing activity of third parties, are in Korea.  User records, including purchase

24  records, which would be required to assess possible damages, are in Korea.  This

25  factor therefore favors dismissal.

26       Plaintiff, naturally, undersells the volume of translation that will be required

27  by failing to account for internal communications that go towards establishing or

28  disproving willfulness, negotiations with third-parties regarding the licenses at issue,

and indeed, the sheer volume of documents relating to the licensing of all 303 sound recordings at issue.  Plaintiff's attempt to distinguish *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368 (Fed. Cir. 1994) because that case involved a "hyper-technical" patent that was supposedly difficult to translate, (Opp. at 9 n. 6), finds no support in the opinion.  Indeed, the reviewing court affirmed the trial court's dismissal based on *forum non conveniens* after favorably noting that "having to agree on the proper translation of laws, documents and other communications" complicated the trial court's job, a factor which favored dismissal.  *Id.* at 1376 (further noting that "general concerns respecting international comity counsel against exercising jurisdiction over a matter involving a Japanese patent, Japanese law, and acts of a Japanese defendant in Japan").  Likewise here, a matter involving Korean copyrights, Korean law, and acts of a Korean defendant in Korea should be resolved in a Korean court.

### c.   Evidence From Third Parties Is More Easily Obtained In Korea.

Evidence from relevant third parties is more easily obtained in Korea, a factor which favors dismissal.  As an initial matter, the American third-parties, Beats Music and MediaNet, will play an infinitesimal role if any in this dispute.  Quantitatively, Plaintiff has identified 19 sound recordings that it alleges were provided to Beats Music, or 6% of the total sound recordings it has asserted in this lawsuit.  Accordingly, even assuming for the sake of argument that third-party testimony is important as to those 19 sound recordings, those recordings represent but a sliver of the overall block of recordings asserted, and thus, the relative importance of third-party testimony relating to them matters very little to the case.

Qualitatively, the evidence that Plaintiff expects to obtain from the American third-parties appears trivial and redundant.  Plaintiff states that it expects MediaNet and Beats to testify about (i) how and from whom they received "infringing sound recordings"; (ii) revenues paid to defendants for the infringing works; (iii) how

3155283.3

13

those recordings were further distributed to American consumers.  Again, the more important issue concerning the recordings provided to Beats Music is ownership, not the provision of recordings, which CJ E&M Corporation does not deny, nor any alleged subsequent distribution to American consumers.  In any event, evidence about what recordings were provided to Beats Music, and what revenue that third-parties have paid to Defendant CJ E&M Corporation if any, are undoubtedly equally available from CJ E&M Corporation.[4]

Moreover, Plaintiff is wrong to suggest that a request for discovery from U.S. third-party witnesses would be unavailable through Section 1782 because of the more limited discovery in Korean courts.  *See, e.g.*, Order Granting Motion for Leave to Take Discovery, *In re: Proceedings Before the Korean District Court in the Republic of Korea*, No. 02-2097 (W.D. Wash. Nov. 1, 2002), ECF No. 13 (district court granting application for leave to take deposition of employee of defendant's U.S. subsidiary in a matter pending for the Busan District Court in Korea).  In that case, the party opposing discovery argued that the Korean court would be offended by deposition procedures in the U.S. because such procedures are typically not allowed in Korea.[5]  *Id.* at 3-4.  In rejecting that argument and allowing the requested discovery, the district court noted that "the Ninth Circuit has . . . held that a party seeking discovery under Section 1782 need not show that the information it seeks through discovery is discoverable in the foreign proceeding."  *Id.* (citing *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 669 (9th Cir. 2002)).

---

[4]   Furthermore, "(iii) how those recordings were further distributed to American consumers" would be subsumed under the second category—revenues paid to defendants—since defendants are presumably paid after consumers purchase the music, which records would be expected to be ordinarily maintained.

[5]   While pre-trial depositions are normally not permitted in Korea, Plaintiff itself contends that, "evidence in this case will primarily consist of documents."  (Opp. at 8.)

1    Here, the third-parties that are relevant, i.e., the companies that can provide

2  evidence of ownership, either by CJ E&M or by DFSB, all reside in Korea.

3  Contrary to Plaintiff's assertion (Opp. at 1), a Korean court would have subpoena

4  power to compel those third parties to appear at a trial (Yang Decl. ¶ 12), a

5  proposition that is decidedly less certain before this Court.  This factor therefore

6  favors dismissal.

7    Plaintiff again relies on specious evidence to suggest that this Court would be

8  able to implead Neowiz Internet, one of the third-party content providers with whom

9  Defendant CJ E&M contracts and who owes it an indemnity obligation.  (*See* Cho

10  Decl., Exh. 11.)  The "Content Provision Agreement" that was submitted as part of

11  Exhibit 11 to the Cho Declaration, a Korean-language version of which was

12  attached as Exhibit "C" to the Lee Declaration, is the English-translated version of

13  the underlying licensing agreement between "Neowiz Internet Corporation" and CJ

14  E&M.  The corporate address for "Neowiz Internet Corporation" is listed as "645-14

15  Daewangpangyo-ro, Bundang-gu" in Korea.  (Cho Decl., Exh. 11.)  To suggest that

16  the company has a U.S. presence, Plaintiff submits as evidence a LinkedIn profile of

17  a "Marvin Park" who self identifies as having been employed at "Neowiz

18  Entertainment" a "U.S.-based mobile studio" that he identifies as having founded.

19  (Cho Decl., Exh. 10.)  Plaintiff further submits as "evidence" the results of a

20  business entity search for a "Neowiz Internet, Inc." that has since dissolved to

21  suggest that this Court could exercise its jurisdiction over "Neowiz Internet

22  Corporation."  Plaintiff's argument is dubious at best.  By contrast, Defendants

23  would have no issues enforcing Neowiz's indemnity obligations in Korea.  (Yang

24  Decl. ¶ 12.)  This is a favor that favors dismissal.  *See Howe v. Goldcorp Invest.*

25  *Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (because "only Canadian courts, and not

26  courts within the United States, have the legal power to compel testimony of twelve

27  Canadian potential witnesses who are not under the control of either party" the

28  private interests weighed heavily in favor of dismissal); *Allstate Life Ins. Co. v.*

1    *Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993).

2       The private interest factors therefore support dismissal in favor of a Korean

3  forum, a showing that Plaintiff has failed to rebut.

4             **3.**     **The Court should dismiss this action in the interest of**

5                   **judicial economy and the public's convenience.**

6       Courts consider the following public interest factors: (i) local interest of the

7  lawsuit; (ii) avoidance of unnecessary problems in conflicts of laws, or in

8  application of foreign laws; (iii) burden on local courts and juries; (iv) congestion in

9  the court; and (v) the costs of resolving a dispute unrelated to this forum. *See Lueck*,

10  236 F.3d at 1147.

11            **a.**     **A Court Would Have To Apply Predominantly Korean**

12                  **Law.**

13       Plaintiff is incorrect that a court would have to apply mostly U.S. law in

14  resolving this lawsuit.  (Opp. at 14.)  As set forth above, the primary issue in this

15  dispute concerns *ownership* of the rights to the asserted sounds recordings.  The

16  question of copyright ownership of a work is governed by the laws of that work's

17  country of origin.  *Lahiri v. Universal Music & Video Dist.*, 513 F. Supp. 2d 1172,

18  1176 n.4 (C.D. Cal. 2007).  Here, the sound recordings at issue originate from

19  Korea, and thus, Korean copyright law must be applied to the question of

20  ownership, including specifically whether any purported assignment of rights was

21  effective and the nature of the interest assigned, if any, such as overseas rights and

22  specific territorial rights.

23       Further, while the applicable law will be the law of the country in which the

24  infringement occurred (Yang Decl. ¶¶ 9-10), there is no support for Plaintiff's

25  assertion that U.S. law will automatically apply to the dispute solely because the

26  alleged distribution occurred in the U.S.  (Opp. at 14.)  Rather, a court will have to

27  determine, based on its choice-of-law principles, which acts, exactly, constitute

28  infringement (e.g., authorizing the provision of recordings, or the actual

dissemination of copies), and thereby, the actual locus of the infringement.  For instance, in order for U.S. copyright law to apply, "at least one alleged infringement must be completed entirely within the United States[.]"  *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1098 (9th Cir. 1994).  This did not include, the "mere authorization of extraterritorial infringement" from within the United States.  *Id.*  This is because "United States copyright laws do not reach acts of infringement that take place entirely abroad."  *Id.*  If the court determines that the act of uploading sound recordings for which it does not hold the rights constitutes infringement, then Korean law should apply, since those acts occurred entirely in Korea.  Likewise, if a court is asked to assess secondary liability, as is likely concerning the allegations regarding the "Mnet" website, then the infringing activity, e.g., knowledge and encouragement, would have had to have occurred in Korea.  If the court determines, rather, that the further distribution of those recordings to American consumers is the infringing activity, then U.S. law would apply.  Plaintiff is incorrect, though, to suggest that a court would as a matter of course have to apply U.S. law to the infringement inquiry.

Moreover, a court would also have to interpret the scope and preclusive effect of the release language contained in the settlement agreement from the 2011 Korean litigation (the "2012 Korean settlement"), which was drafted, negotiated, and executed in Korea and is governed by Korean law.  Plaintiff's attempt to distinguish the claims brought in the 2011 Korean litigation that led to the settlement is puzzling and belied by the evidence.  Plaintiff brought a claim for "Illegal overseas distribution of digital music content by defendant" in the 2011 Korean litigation. (Cho Decl., Exh. 1 at 10-11.)  A side-by-side comparison of the claims asserted then and here underscore the similarity of the allegations:

| 2011 Korean litigation | March 6, 2015 complaint |
| --- | --- |
| "Defendant allowed overseas users using overseas IP to illegally stream and download | "CJ E&M, via its website www.mnet.com, made available in the United States over 300 works |

17

| 3947 songs distributed overseas by the plaintiff . . . from the sites www.mnet.com and music.naver.com operated by the defendant." (Cho Decl., Exh. 1 at 10-11.) | to which DFSB Kollective—not CJ E&M—has the exclusive right to distribute within the United States." (Compl. ¶ 3.) |
|---|---|
| "Furthermore, despite the fact that ISRC code must be issued in order to distribute digital music content overseas, defendant illegally distributed the content without even receiving the ISRC code from the plaintiff, who manages and issues domestic ISRC code." (Cho Decl., Exh. 1 at 11.) | "DFSB Kollective has assigned an International Standard Recording Code ("ISRC") to each of the works and a Universal Product Code ("UPC") to their albums." (Compl. ¶ 16.)<br><br>"Defendants are not ISRC managers. . . . Consequently, Defendants should not be assigning new ISRC codes to recordings on behalf of third parties.'" (Compl. ¶ 21.) |
| "Furthermore, defendant also distributed the digital music contents like those listed above for free along with dumping the price[.]" (Cho Decl., Exh. 1 at 11.) | "CJ E&M has priced these works at less than $0.10 per track to U.S. consumers and even given away these works for free in the U.S." (Compl. ¶ 39.) |
| "This is illegal breach of plaintiff's overseas distribution rights and unlawful bargain sales action that goes against fair trade laws." (Cho Decl., Exh. 1 at 11.) | "Defendants, in excess of the scope of any license and without DFSB Kollective's permission, have distributed to the U.S. public . . . sound recordings to which DFSB Kollective has exclusive rights[.]" (Compl. ¶ 41.) |

In sum, the claims that Plaintiff asserts here are nearly identical to those it asserted in the earlier Korean litigation.

As part of that case's disposition, the court ordered that "Plaintiff shall withdraw remaining claims and both plaintiff and defendant shall not submit any other civil claims such as compensation for damages etc. in relation to the agreement of this case." (Cho Decl., Exh. 1 at 2.) The Court will have to interpret and determine the scope and preclusive effect of that release language in the 2012 Korean settlement under Korean law.

Because questions of Korean law will predominate, this factor weighs in

1  favor of dismissal.

2  **b.**    **There Is No Local Interest In Resolving This Case Before This Court**

3

4       This is a dispute between two Korean companies who both claim to own

5  specific rights relating to Korean property.  Thus, as in *Creative Technology, Ltd. v.*

6  *Aztech Systems PTE*, 61 F.3d 696 (9th Cir. 1995), this "is not a case involving the

7  [infringement] of American made products or substantively involving American

8  companies." *Id.* at 704.  The primary right involved is the distribution right to

9  Korean-copyrighted sound recordings.  The entire case involves the alleged

10 infringement of that primary right.  (Mem. at 15.)  Where that infringement occurred

11 is secondary to the primary right that was infringed.  Accordingly, there is no local

12 interest in having this case resolved before this Court.

13      Plaintiff has not shown why this district has a local interest in this litigation.

14 While "Korean pop music . . . is successful in Los Angeles" as Plaintiff notes, (Opp.

15 at 14), again, what is getting popular is contemporary K-pop, such as G-Dragon and

16 Girls' Generation, not music by Korean indie-rock bands.  The local Korean interest

17 in resolving this dispute is much stronger than this forum's.  The allegations involve

18 the country's largest entertainment and media conglomerate, and the Plaintiff is a

19 Korean company with its principal place of business in Seoul.  To the extent that

20 Korean pop music is getting more popular worldwide, as Plaintiff claims, then *a*

21 *fortiori*, the Korean interest in the dispute is more significant.

22 **c.**    **It Would Be A Waste Of Judicial Resources To Try This Case Here.**

23

24      Plaintiff's evidence corroborates, not refutes, the evidence offered by CJ

25 E&M America, that the time to trial in this district is approximately 20 months.

26 (Opp. at 15-16.)  On the other hand, the time to trial in a Korean court is expected to

27 be significantly less.  (Yang Decl. ¶ 11.)  Plaintiff's attempt to undercut that reality

28 by asserting that most cases settle is speculative at best.  (Opp. at 16.)  The

1  congestion in this Court favors dismissal, especially because this case is so unrelated

2  to this forum in the first place.  Since this case is so unrelated to this district, it

3  would be unfair, as well as a waste of time and money, to require citizens in this

4  district to sit on a jury to resolve it.  This factor therefore favors dismissal.

5      Therefore, the public interest factors tip heavily in favor of a Korean forum, a

6  clear showing that Plaintiff has not and cannot rebut.

7      **4.      This motion should be granted based on *forum non conveniens*.**

8

9      In summary, as CJ E&M America has clearly shown, and Plaintiff concedes,

10  Korea is an adequate forum and Defendants are amenable to suit there.  Moreover,

11  the balance of the private and public interest factors show clearly that the burden

12  and inconvenience of resolving this action before this Court weighs towards

13  dismissal in favor of a Korean court.  Thus, this Court should in its broad discretion

14  decline to hear this case based on the doctrine of *forum non conveniens* and dismiss

15  it in its entirety so that it can be refiled in Korea.

16      **B.      Plaintiff Has Failed To State A Claim For Relief.**

17      Plaintiff has failed in its opposition to show that its complaint contains

18  allegations that state claims of relief that are "plausible" on their face, and thus, its

19  claims must fail.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This Court, after

20  all, is "not bound to accept as true [legal conclusions] couched as factual

21  allegation[s]." *Id.*

22      **1.      Plaintiff has failed to state a claim for copyright infringement.**

23

24      While a plaintiff asserting copyright infringement is required to plead facts

25  establishing ownership of the copyrights at issue, Plaintiff has repeated only bare

26  legal conclusions that it has "exclusive rights" or "exclusive licenses" to the asserted

27  sound recordings.  (Mem. at 17.)  As an initial matter, Plaintiff's argument in its

28  opposition that the copyright owners of the asserted sound recordings can be found

on the website of the U.S. Copyright Office rings hollow, since a complaint must state a claim to relief that is "plausible on its face." *Id.* Since it has failed to plead facts sufficient to establish ownership, Plaintiff's copyright infringement claim must be dismissed.

Moreover, Plaintiff is incorrect that any of Defendant's arguments are directed at Plaintiff's allegations regarding the "Mnet" website. (Mem. at 19.) That is because Plaintiff's complaint makes no allegations directed specifically against CJ E&M America regarding the "Mnet" website. (Compl. ¶¶ 30-38.)

In any event, this Court should not be persuaded by the secondary authority that Plaintiff cites to support the proposition that "making available" copyrighted works violates the copyright owner's distribution rights. (Opp. at 19.) Notwithstanding Plaintiff's attempts to distinguish the holding based on a leading treatise, the district court's holding in *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006) that a distribution requires, at a minimum an actual "dissemination" of copies to the public, is good law that should be persuasive to this Court. Thus, since Plaintiff has failed to allege that any sound recordings were actually disseminated to the public, it's copyright infringement claim must be dismissed.

### 2.  Plaintiff has failed to state a claim for violations of the DMCA.

As a threshold matter, CJ E&M America disagrees with Plaintiff's spectacularly generous reading of its own complaint to support that it specifically alleged that *CJ E&M America* had intentionally removed or altered any copyright notices.[6] (Opp. at 21.) Paragraph 28 of the complaint, cited by Plaintiff in support, certainly contains no such allegation. (Compl. ¶ 28.) Likewise, Paragraph 50

---

[6]   Hence, Defendant makes no concession that copyright notices comprise "copyright management information" under the Digital Millennium Copyright Act ("DMCA").

merely contains a broad general allegation that *Defendants* "intentionally committed at least four acts per infringing work" that purportedly amount to "providing/distributing incorrect copyright notices for the underlying works ***and/or*** removing/altering the correct copyright notices for the underlying works." (Compl. ¶ 50.) What CJ E&M America precisely did is not clear. Indeed, the complaint does not say. Thus, Plaintiff's allegations fail the heightened requirements under the Supreme Court's opinion in *Twombly*. *Bell Atlantic Corp.*, 550 U.S. 544, 555 (2007) (complaint must contain more than a "formulaic recitation of the elements of a cause of action").

As for ISRCs and UPCs, Plaintiff has failed to establish that they comprise "copyright management information" under the statute. Plaintiff invites this Court to adopt an impossibly broad reading of Section 1202 that would subsume all manner of identifying information that could even loosely be connected to sound recordings. (Opp. at 21-22.) For those reasons, the court in *Textile Secrets Int'l, Inc. v. Ya-ya Brand, Inc.*, 524 F. Supp. 2d 1184 (C.D. Cal. 2007) adopted an appropriately "narrowing interpretation" that this Court should follow. *Id.* at 1201. The cases cited by Plaintiff in opposition do not change that *Textile Secrets* is good law and persuasive authority that is entitled to substantial deference. *See, e.g.*, *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 351 (D. Md. 2003) (describing precedent from own district as "persuasive authority entitled to substantial deference").

Since ISRCs and UPCs cannot as a matter of law be considered "copyright management information" under the "narrowing interpretation" adopted by *Textile Secrets*, Plaintiff's claims for violations of Section 1202 of the DMCA should fail as a matter of law and should therefore be dismissed.

### C.     Plaintiff Lacks Standing To Sue.

#### 1.     Facial Attack.

In its opening brief, Defendant argued that DFSB lacks standing because:

(i) it has failed to allege facts establishing that it is the owner of any rights in the asserted sound recordings, and (ii) Plaintiff is not entitled to bring copyright infringement claims on behalf of others that accrued before Plaintiff acquired an exclusive right in the underlying works.  (Mem. at 23.)

In attempting to refute the first point, Plaintiff merely repeats the insufficient legal conclusion from its complaint that DFSB has "exclusive licenses to reproduce, distribute, publicly perform and publicly display in the United States" the copyrighted works.  (Opp. at 24.)  Again, DFSB in its complaint has failed to identify from whom and in what manner (not to mention when) those licenses were received, and for that reason, it has failed to plead sufficient facts establishing ownership of an exclusive right sufficient to confer it standing.  (Mem. at 17-18.)

For the second point, Plaintiff relies on dicta from *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005), for the proposition that Plaintiff could have acquired both (i) causes of action that had already accrued on behalf of others and (ii) exclusive substantive rights by transfer.  But the Ninth Circuit has never so held, and Defendant is not aware of any controlling authority to support Plaintiff's position.  Indeed, the holding in *Silvers* was that a bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b).  *Id.* at 890.  Hence, Plaintiff should not be permitted to bring infringement claims for any works for which it did not hold an exclusive substantive right at the time of the alleged infringement.

## 2. Factual Attack.

Defendant's motion to dismiss was admittedly not a factual attack on standing.  *See, e.g.*, *Colwell v. Dept. of Health and Human* Services, 558 F.3d 1112, 1121 (9th Cir. 2009) (factual attack on standing permits court to consider matters outside the pleadings, such as affidavits and other extrinsic evidence).  But this Court now has before it unrefuted evidence that CJ E&M—not DFSB—owns the overseas distribution rights to the 19 songs Plaintiff specifically identifies in its

complaint.  This is because DFSB, on its own, has submitted certified translated copies of licensing agreements that show that CJ E&M holds the overseas distribution rights for (i) sound recordings on the album "It" by the band Swallow, (*See, e.g.*, Lee Decl. ¶ 2); and (ii) sound recordings on the album "Get on the Bus" by the band Rhymebus, *id.*  (Cho Decl., Exh. 10.)  This Court can and should consider this evidence.  *See, e.g.*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

For example, Dong-hun Lee declared that "[f]or sound recordings on the album 'It' by the band Swallow, CJ E&M Corporation acquired the distribution rights to those recordings under a licensing agreement by and between Mnet Media, CJ E&M Corporation's, predecessor in interest, and Swallow's record label, Sha Label, dated October 1, 2008."  (Lee Decl. ¶ 9.)  Indeed, Article 2 of the "Records and Music Distribution Agreement" between Mnet Media Corporation reflects that the "agreement includes the global distribution" of the 'contracted records and music'."  Further, Article 3 (the "Contracted Records and Music") states that the music "that are subject to distribution" includes "Swallow's regular 3rd album," which was the "It" album Plaintiff asserts here.[7]  (Cho Decl., Exh. 10.)  Article 9 indicates that the agreement will automatically renew in one-year increments absent a notice of termination.  *Id.*  Hence, the unrefuted evidence shows that CJ E&M, not DFSB owns overseas distribution rights to the recordings by Swallow.

Likewise, the "Content Provision Agreement" between "Neowiz Internet Corporation" and "CJ E&M Corporation" is the agreement by which CJ E&M acquired the overseas rights to Rhymebus's "Get On the Bus" album.  (Lee Decl. ¶ 10; Cho Decl., Exh. 10.)  Specifically, "Advanced Content Investment Agreement,"

---

[7]  *Swallow Vol. 3 – It*, Yesasia.com, http://www.yesasia.com/us/swallow-vol-3-it/1021366925-0-0-0-en/info.html.

24

the Korean-language version of which was attached as Exhibit "D" to the Lee Declaration is the instrument by which Neowiz, through its predecessor in interest, Eins Digital Co. Ltd, acquired the rights to the recordings.  *Id.*  Article 2 of that agreement sets forth that the "agreement serves to stipulate the common rights regarding distribution and neighboring rights for profits resulting from domestic and international online and offline distribution sales of the production of the record in this case[.]"  (Cho Decl., Exh. 10.)  Article 3 specifies that the "Record Subject to Investment" is Rhymebus's first album, which turned into the "Get On The Bus" album.  Hence, the unrefuted evidence shows that CJ E&M, not DFSB owns overseas distribution rights to the recordings by Rhymebus.  While DFSB had the opportunity to provide its own evidence to refute this, since it provided the certified translations in the first place, it elected not to because it cannot.  Therefore, this Court should dismiss Plaintiff's claims because Plaintiff lacks standing to sue, as evidenced by the unrefuted evidence (witness declarations and supporting documents) before this Court.

## III.    CONCLUSION

For the foregoing reasons, this Court should dismiss this action in its entirety based on the doctrine of forum non conveniens.  Alternatively, this Court should dismiss Plaintiff's claims without leave to amend because Plaintiff lacks standing to sue and has failed to state claims for which this Court can grant it relief.

DATED:  May 18, 2015                    Respectfully submitted,

Ekwan E. Rhow
Timothy B. Yoo
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By:  _____*/s/ Timothy B. Yoo*_____
          Timothy B. Yoo
     Attorneys for Defendant
     CJ E&M America, Inc.