1   Ekwan E. Rhow - State Bar No. 174604
        eer@birdmarella.com
2   Timothy B. Yoo - State Bar No. 254332
        tby@birdmarella.com
3   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
4   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
5   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110
6
    Attorneys for Defendants
7   CJ E&M Corporation and CJ E&M
    America, Inc.
8

9              **UNITED STATES DISTRICT COURT**

10    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12   DFSB KOLLECTIVE CO. LTD.,              CASE NO: 2:15-cv-01650-SVW-FFM

13              Plaintiff,                  **DEFENDANTS' NOTICE OF
                                            MOTION AND MOTION TO
14         vs.                              DISMISS PLAINTIFF'S
                                            COMPLAINT BASED ON *FORUM
15   CJ E&M, INC., a Korean corporation;    NON CONVENIENS*;
     CJ E&M AMERICA, INC., a California     MEMORANDUM OF POINTS AND
16   corporation,                           AUTHORITIES IN SUPPORT
                                            THEREOF**
17              Defendants.
                                            [Declarations of Timothy B. Yoo,
18                                          Angela Killoren, Ho-seung Yang,
                                            Dong-hun Lee, and Young-rock Pyo
19                                          Submitted Concurrently Herewith]

20
                                            Date:    January 25, 2016
21                                          Time:    1:30 P.M.
                                            Crtrm.:  6
22
                                            Assigned to Hon. Stephen V. Wilson
23

24

25    **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED**

26                          **UNDER SEAL**

27

28
    3231220.6
    ────────────────────────────────────────────────
    NOTICE OF MOTION AND MOTION TO DISMISS; MEMO OF POINTS AND AUTHORITIES
    CASE NO: 2:15-CV-01650-SVW-FFM

## NOTICE OF MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 25, 2016, at 1:30 p.m., or as soon thereafter as defendants CJ E&M America, Inc. and CJ E&M Corporation (collectively, "Defendants") may be heard before the Honorable Stephen V. Wilson in Courtroom 6 of the above-entitled Court, located at 312 North Spring Street, Los Angeles, CA 90012, Defendants will and hereby do move this Court to dismiss this action for *forum non conveniens* so that it can be refiled in a Korean court.

This motion is supported by this Notice of Motion, the accompanying Memorandum of Points and Authorities; the Declarations of Dong-hun Lee ("Lee Decl."), Angela Killoren ("Killoren Decl."), H.S. Yang ("Yang Decl."), Young-rock Pyo ("Pyo Decl."), and Timothy B. Yoo ("Yoo Decl."); the attached exhibits; and such other evidence and arguments as may be presented at or before the hearing on this motion, and all other matters of which the Court may take judicial notice or which it deems appropriate to consider.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 16, 2015.

DATED:  December 28, 2015          Respectfully submitted,

Ekwan E. Rhow
Timothy B. Yoo
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:     /s/ *Timothy Yoo*
_____
                    Timothy B. Yoo
          Attorneys for Defendants
          CJ E&M Corporation and CJ E&M
          America, Inc.

3231220.6

1

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

I.      INTRODUCTION ............................................................................ 1

II.     SUMMARY OF RELEVANT FACTS .............................................. 2

    A.      Summary of Key Disputes. ................................................. 2

        1.      Distribution of Music Through Beats Music. ............... 3

        2.      Distribution of Music Through Mnet.com. ................... 5

    B.      Factual Background. ........................................................... 8

    C.      Procedural Posture. ............................................................ 9

III.    ARGUMENT ............................................................................... 10

    A.      Korea Is An Adequate Alternative Forum. ........................ 10

    B.      The Private Interest Factors Favor Dismissal. ................... 11

        1.      The Parties And Salient Witnesses Reside In Korea. ................. 11

        2.      Key Sources of Proof Are Located In Korea. ........................... 13

        3.      This Court Cannot Compel Unwilling Non-Party Witnesses. ............................................................... 13

    C.      The Public Interest Factors Favor Dismissal. ................... 19

        1.      The Local Interest In this Lawsuit Is Minimal. ........... 19

        2.      This Court Will Have To Apply Korean Law. ........... 20

        3.      It Is A Waste Of Resources To Try This Matter Here. .............. 22

    D.      Plaintiff's Choice Of Forum Should Be Given Minimal Deference. ......................................................................... 22

IV.     CONCLUSION ........................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbaugh v. Y & H Corp.*,
  546 U.S. 500 (2006) ............................................................ 16

*Gordon v. Nextel Communications*,
  345 F.3d 922 (6th Cir. 2003) .............................................. 12

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947) ............................................................ 2

*Howe v. Goldcorp Invest. Ltd.*,
  946 F.2d 944 (1st Cir. 1991) .............................................. 16

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001) ................................................ 10

*Lahiri v. Universal Music & Video Dist.*,
  513 F. Supp. 2d 1172 (C.D. Cal. 2007) .............................. 20

*Lockman Found. v. Evangelical Alliance Mission*,
  930 F.2d 764 (9th Cir. 1991) .............................................. 10

*Lueck v. Sundstrand Corp.*,
  236 F.3d 1137 (9th Cir. 2001) .................................. 10, 11, 19

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ............................................... 10, 11, 22

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
  329 F.3d 64 (2d Cir. 2003) ................................................ 23

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ............................................................ 10

**Statutes**

Digital Millennium Copyright Act section 1202 ............................ 2, 4, 12

**Other Authorities**

Federal Rule of Civil Procedure 30(b)(6) ........................................ 12

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

The total amount of royalties paid to Defendant CJ E&M Corporation ("CJ E&M") for distribution of the Korean sound recordings at issue is ███████ (Yoo Decl. Exh. A.)  But while the amount in controversy is ██████ the corresponding effort, cost, and inconvenience to the parties, this Court, and the public in determining at trial which Korean company is entitled to ██████████ ██████ will be disproportionately huge.  For that reason, this action should be dismissed based on the doctrine of *forum non conveniens* in favor of a Korean court, where it can be more appropriately heard.

Indeed, as fact discovery has confirmed, this is a Korean property dispute between two Korean companies over who held what rights to Korean sound recordings, the underlying ownership of which is governed by Korean law.  As such, most of the witnesses and sources of proof regarding the disputed issues are in Korea.  For instance, depositions of no less than three of CJ E&M's key witnesses are scheduled to take place in Korea next month, after the hearing on this motion. Furthermore, this Court will have to apply Korean law to facts that will not likely be at its disposal when deciding this lawsuit's central issue: whether Plaintiff DFSB Kollective Co. Ltd. ("DFSB") or CJ E&M held the U.S. distribution rights to the asserted Korean music during the relevant periods.  Attaining certainty on that issue, however, could require additional testimony and documents from non-party witnesses that are likely outside the subpoena power of this Court but squarely within the purview of a Korean court, the least-cost avoider of trying this dispute.

Conversely, the level of deference given to DFSB's choice of forum should be minimal, since DFSB is a foreign plaintiff who is admittedly forum shopping so it can pursue the maximum settlement amount in a U.S. court.  ████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████

1 ███████████████████████████████████████████████

2 ████████████████████████████████████  (Yoo Decl. Exh. C.)  Thus,

3 DFSB's *stated purpose* in bringing this action was to vex Defendants with

4 oppressive logistical burdens and the specter of hefty statutory damages in order to

5 leverage that nuisance value into what it hoped would be a quick settlement and

6 payday.  This lawsuit is merely the culmination of that wealth-transference scheme.

7 For instance, Mr. Cho confirmed at deposition that he had set out to sue CJ E&M

8 many months *before* he purported to obtain, at the direction of his current litigation

9 counsel, the "exclusive rights" that gave him the hook to do so.  Mr. Cho further

10 admitted at deposition that he was not personally aware of anyone in the U.S. having

11 been able to buy music from the mnet.com website during the statutory period, one

12 of DFSB's key allegations.  In other words, Plaintiff has placed the cart before the

13 horse in a transparent attempt to harass Defendants into a favorable settlement.

14      This is precisely the scenario that the doctrine of *forum non conveniens* is

15 meant to thwart.  *See, e.g.*, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)

16 (judiciary has inherent authority to decline jurisdiction in instances in which

17 plaintiffs "seek not simply justice but perhaps justice blended with some

18 harassment").  Fortunately, this Court need not ask the jury pool and the good

19 citizens of this forum to indulge Plaintiff's misplaced opportunism.  Rather, in

20 consideration of the enormous inconvenience to the parties of resolving this dispute

21 before this Court, and in the interest of judicial economy, this Court can and should

22 dismiss this action in its entirety so that it can be refiled in a Korean court.

23 **II.   SUMMARY OF RELEVANT FACTS**

24      **A.   Summary of Key Disputes.**

25      Plaintiff has asserted claims for copyright infringement and violations of

26 section 1202 of the Digital Millennium Copyright Act ("DMCA") against

27 Defendants based on three categories of alleged bad acts:

28      (1)   distribution of music in the United States through the Beats Music

1          streaming service;

2      (2)    altering information related to the music provided to Beats Music; and

3      (3)    distribution of music in the United States through the mnet.com

4          website, which is housed in Korea.

5  (Dkt. No. 1 ["Compl."] at ¶¶ 2, 3, 22-27, 30-37, 50.)

### 1.    Distribution of Music Through Beats Music.

For the first two categories, Defendant CJ E&M Corporation does not dispute that it provided certain sound recordings to the Beats Music service for distribution in the United States.  (Lee Decl. ¶¶ 4-5.)  Rather, the disputed issues are (i) whether CJ E&M Corporation held the proper rights to do so; and (ii) in so doing, whether it altered information associated with those sound recordings that can be considered "copyright management information" under the DMCA ***with*** the express intent of facilitating copyright infringement.

Among the 303 songs identified by Plaintiff in its complaint, CJ E&M Corporation provided a total of 36 songs to the Beats Music service: 9 songs from the "It" album by the artist Swallow, 10 songs from the "Get On the Bus" album by the group Rhymebus, and 17 songs from the "The Life . . . DOC Blues" album by the group DJ DOC.  (*Id.*)  It provided those 36 songs via digital files sent to MediaNet, a content fulfillment intermediary which then uploaded those files to the Beats Music service.  (*Id.*)  The issues pertaining to Beats Music will thus focus on who, as between CJ E&M Corporation and DFSB, held the proper distribution rights to these songs.

For the "It" album, CJ E&M Corporation acquired the U.S. distribution rights to those 9 songs through a licensing agreement dated October 1, 2008 between Mnet Media, CJ E&M Corporation's predecessor in interest, and Swallow's record company, Sha Label.  (*Id.* at ¶ 6.)  For the songs from the "Get On the Bus" and "The Life . . . DOC Blues" albums, CJ E&M Corporation acquired the U.S. distribution rights to those 27 songs through a licensing agreement dated April 1,

1    2014 between CJ E&M Corporation and Korea-based content-provider Neowiz

2    Internet.  (*Id.* at ¶ 7.)

3         By contrast, Plaintiff DFSB claims that it acquired the U.S. distribution rights

4    to the "It" album through an "exclusive distribution agreement" dated December 23,

5    2014.  (*See* Yoo Decl. Exh. F.)  It likewise claims to have acquired the U.S.

6    distribution rights to "Get On the Bus" and "The Life . . . DOC Blues" by an

7    exclusive agreement dated December 19, 2014.  (*See* Yoo Decl. Exh. E.)  A court

8    must therefore determine who held the proper distribution rights during the relevant

9    periods, questions that will require interpretation of Korean law, and quite probably,

10   testimony from witnesses residing in Korea and outside the subpoena power of this

11   Court.

12        On top of the threshold issue of whether CJ E&M or DFSB held the proper

13   rights under Korean law, the ownership issue is inextricably tied to DFSB's DMCA

14   claims, since a predicate to establishing liability under a section 1202 claim is

15   proving that CJ E&M acted "knowingly with the intent to induce, enable, facilitate,

16   or conceal infringement" when it provided digital files to Beats Music through

17   MediaNet.  17 U.S.C. § 1202.  So DFSB must establish both (i) an underlying

18   infringement; and (ii) CJ E&M's *knowing intent* to induce, enable, facilitate, or

19   conceal that infringement by tampering with "copyright management information"

20   under the statute.  If, for instance, CJ E&M provided information to Beats Music

21   with the earnest, good-faith belief that it held the distribution rights to the music at

22   issue, then that would tend to vitiate the intent element and undercut DFSB's claim.

23   But as with who holds the underlying rights in the first place, that question will

24   require an extensive factual investigation in Korea, since all of the key party

25   witnesses, non-party witnesses, and evidence sit in Korea.

26        For perspective regarding the U.S.'s economic interests in this lawsuit's

27   subject matter, as part of discovery, Beats Music has produced a royalty report

28   summarizing the total amount of royalties paid to CJ E&M Corporation as a result

of users streaming the above songs on the Beats Music service during the statutory period.  (Yoo Decl. Exh. A.)

## 2.    Distribution of Music Through Mnet.com.

For music that is distributed on the mnet.com website, CJ E&M has since 2011 implemented an IP geo-fence such that sound recordings available on the website in Korea are not available for purchase by users accessing the website from the U.S. (with a U.S.-based IP address).  (Pyo Decl. ¶ 4.)  Thus, it should not be technically possible, absent some deliberate attempt to evade or bypass the geo-fencing functionality, for U.S.-based users to buy music from the mnet.com website. In fact, DFSB's President, Bernard Cho, admitted during his recent deposition that he has no personal knowledge of anyone located in the United States having been able to purchase music, while in the United States, from the mnet.com website since March 6, 2012, i.e., the applicable statutory period.  Instead, he stated that "this is something we are hoping that evidence discovery will reveal."  (Yoo Decl. Exh B ["Bernie Cho Rough Tr."] at 225:3-8.)

As part of discovery, CJ E&M Corporation has reviewed its own payment database and found that, out of the approximately 60 million transactions that were processed through the mnet.com website during the statutory period, there was a single transaction that appears to have emanated from the U.S.  (Pyo Decl. ¶¶ 5-7.)

1    Importantly, that lone transaction does not concern any of the 303 songs identified
2    in DFSB's complaint.  (*Id.* at ¶ 8.)  Moreover, a further investigation is required to
3    determine whether that transaction in fact occurred in the U.S., or rather, by a person
4    simulating a U.S. location.  Nevertheless, CJ E&M will permit a third-party auditor
5    hired by DFSB to review its payment systems to confirm the foregoing, and the
6    parties are presently finalizing the timing and protocol of such a review, which will
7    occur in Korea in January 2016.[1]  (Yoo Decl. ¶ 18.)

8          Also as part of its investigation, CJ E&M contacted a third-party, SK Planet
9    Co. Ltd., one of Korea's largest telecommunications providers, to confirm whether
10   there had been any overseas transactions through SK's proprietary mobile
11   application and online market, T store.  (Pyo Decl. ¶ 9.)  SK Planet reported four
12   instances in which any of the songs among the 303 songs identified in DFSB's
13   complaint were paid for outside of Korea using a Korean credit card on T store.  (*Id.*
14   at ¶ 10.)  Importantly, T store is an application accessible only on Korean mobile
15   phones, which services can only be subscribed to by persons located in Korea
16   holding a Korean resident registration number.  (*Id.* at ¶ 11.)

17         Hence, the issues related to distribution through the mnet.com website will
18   focus primarily on whether CJ E&M Corporation's efforts to restrict foreign
19   purchases on the website—to the extent that it did not have distribution rights in
20   certain territories—were proper and sufficient.  This assumes, of course, that CJ
21   E&M did not have the U.S. distribution rights for the songs distributed through
22   mnet.com and identified in DFSB's complaint, a point that CJ E&M does not
23   concede, as discovery is ongoing.  In other words, even if DFSB is able to adduce
24   evidence that U.S.-based users were able to buy music from the mnet.com website,
25   which should not have been technically possible as part of the website's normal

26   _____
     [1]   Korean privacy laws prevent CJ E&M Corporation from being able to produce
27   wholesale the data contained in its payment database, which contains personal
     identifying information.
28

1    operation, it will have to prove that CJ E&M did not have the overseas distribution

2    rights for that music.  Again, those issues will require application of Korean law,

3    and quite probably, testimony from witnesses located in Korea and outside this

4    Court's subpoena power.

5         Furthermore, there is a dispute regarding the preclusive effect of an earlier

6    settlement agreement resolving a 2011 litigation in Korea between DFSB and CJ

7    E&M Corporation (the "2011 Korean litigation").  As part of that 2011 Korean

8    litigation, as confirmed during Bernard Cho's recent deposition, DFSB alleged that

9    CJ E&M Corporation had "allowed overseas users using overseas IP to illegally

10   stream and download 3,947 songs . . . from . . . www.mnet.com . . . operated by [CJ

11   E&M Corporation]."  (Yoo Decl. Exh H ["2012 Korean settlement order"] at 10-

12   11.)  That is, during the 2011 Korean litigation, DFSB accused CJ E&M

13   Corporation of illegally distributing music through the mnet.com website without

14   permission, i.e., copyright infringement:

15        Q.  Essentially didn't you allege that CJ E&M had distributed digital

16        music overseas without the artist's [*sic*] permission?

17        A.  Yes.

18   (Bernie Cho Rough Tr. 193:3-6.)  This is identical to the claim DFSB asserts here

19   regarding overseas distribution of music on mnet.com:

20        Q.  You were alleging that CJ E&M is distributing music overseas

21        through the mnet.com website without the artist's [*sic*] permission.

22        That is what you are alleging in this lawsuit; correct?

23        A.  That is correct.

24   (*Id.* at 194:12-16.)

25        As part of the August 2012 settlement agreement resolving the matter, DFSB

26   agreed to (i) "withdraw" its remaining claims, including its claims of illegal

27   overseas distribution through mnet.com; and (ii) "not submit any other civil claims

28   such as compensation for damages, etc. in relation to the agreement of this case."

1   (2012 Korean settlement order at 2.)  Hence, DFSB agreed to release all claims

2   regarding the alleged "illegal overseas distribution" of music on mnet.com.  DFSB,

3   on the other hand, contends that the scope of the release language is much narrower,

4   and is limited to the contractual claims—unrelated to the claims pertaining to

5   mnet.com—that were resolved as part of the settlement.  (Bernie Cho Rough Tr.

6   200:2-204:3.)  A court will therefore have to determine the scope and effect of the

7   foregoing release language, which is governed by Korean law.

8       **B.     Factual Background.**

9       Defendant CJ E&M Corporation is a Korean entertainment and media content

10  company comprised of five core divisions: film, cable broadcast, music, online, and

11  live performances.  The music division is responsible for all music licensing,

12  including licensing for recording artists under CJ E&M's management as well as

13  licensing content to and from third parties.  This includes curating all of the music

14  content on the mnet.com website, which is administered by CJ E&M's online

15  division.  (Lee Decl. Exh. A ["April 29, 2015 Lee Declaration"] at ¶ 11.)

16  Meanwhile, Defendant CJ E&M America is essentially the American arm for CJ

17  E&M's movie and cable broadcast divisions.  CJ E&M America has no music

18  division, and is not involved in music licensing whatsoever, nor is it involved in the

19  back-end or front-end administration of the mnet.com website.  (Killoren Decl. ¶¶ 4-

20  5, 12.)

21      In January 2014, CJ E&M Corporation signed a content distribution

22  agreement with Beats Music, whereby CJ E&M agreed to provide music content to

23  the Beats Music streaming service, which launched later that year.  (*Id.* at ¶ 6; April

24  29, 2015 Lee Declaration at ¶ 8.)  That agreement was negotiated entirely by

25  members of CJ E&M's music division in Korea.  (*Id.*)  CJ E&M provided music by

26  sending digital files from Korea directly to MediaNet, which then uploaded those

27  files to the Beats Music service.  (Lee Decl. ¶ 5.)  Nobody at CJ E&M America had

28  any direct contact with anybody at MediaNet.  (Killoren Decl. ¶ 8.)  Consequently,

1  nobody at CJ E&M America was involved in the provision of, or any discussion

2  relating to, the digital files provided to Beats Music.  (*Id.*)

3      CJ E&M America's only involvement in the Beats Music project was lending

4  marketing support to raise awareness that K-pop music was available on the Beats

5  Music service.  (*Id.* at ¶ 7.)  But CJ E&M America does not receive any revenue

6  from Korean music that is streamed or otherwise accessed on Beats Music.  (*Id.* at ¶

7  9.)  In fact, CJ E&M America has not received any revenue from Korean music that

8  is in any way streamed, downloaded, or access from the United States.  (*Id.* at ¶ 10.)

9  **C.    Procedural Posture.**

10     Plaintiff initiated this action on March 6, 2015.  Defendants CJ E&M

11  America, Inc. and CJ E&M Corporation were served with the complaint and

12  summons in March 2015 and May 2015, respectively.

13     Prior to discovery and in response to the complaint, Defendant CJ E&M

14  America moved this Court to dismiss this action for *forum non conveniens* on April

15  29, 2015.  This Court, in part citing an as-yet "undeveloped record," denied CJ

16  E&M America's motion "WITHOUT PREJUDICE" by minute order on June 4,

17  2015.  (Dkt. No. 24 ["June 4, 2015 minute order] at 6.)  Defendants subsequently

18  answered the complaint on June 19, 2015.  Discovery has since commenced and has

19  been ongoing.

20     Plaintiff DFSB's President and CEO, Bernard Cho, was deposed on

21  December 4, 2015.  (Yoo Decl. ¶ 3.)  CJ E&M America's 30(b)(6) witness as to

22  certain designated topics, Angela Killoren, was deposed on December 15, 2015.  As

23  of the undersigned date, no other witnesses have been deposed.  Depositions of CJ

24  E&M Corporation's 30(b)(6) witnesses have been scheduled for the week of

25  January 25, 2016 in Seoul, Korea.  (Yoo Decl. ¶ 17.)

26     A trial before this Court is scheduled to begin on March 1, 2016.  (Dkt. No.

27  32.)

28

## III.   ARGUMENT

Under the doctrine of *forum non conveniens*, a district court has substantial discretion to dismiss an action in favor of litigation in a more convenient foreign forum if defendants establish: (i) that an alternative and adequate foreign forum exists; and (ii) that the balance of the relevant private and public interests weighs in favor of dismissal. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001). If "the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991) (citation omitted).  Moreover, a district court's decision to dismiss an action based on *forum non conveniens* "may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Lueck*, 236 F.3d at 1143 (citations omitted).

And while a plaintiff's choice of forum is normally accorded due deference, a court should accord less deference where, as here, the plaintiff is a foreign citizen that has chosen a forum outside of its home forum.  *See Piper Aircraft Co.*, 454 U.S. at 247 ("a foreign plaintiff's choice deserves less deference.")  This is particularly true when a plaintiff's choice of forum is based, as it is here, on forum shopping. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) ("[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping, . . . the less deference the plaintiff's choice commands.").

### A.   Korea Is An Adequate Alternative Forum.

A forum is considered "available" when all defendants are amenable to suit in that forum and that forum permits suits involving the subject matter of the dispute. *Lueck*, 236 F.3d at 1143.  An alternative foreign forum is "adequate" if it provides the plaintiff a potential avenue for redress.  *See Piper Aircraft Co.*, 454 U.S. at 254

n.22.  Plaintiff has already conceded as it must that Korea is an adequate alternative forum.  (Dkt. No. 14 ["May 11, 2015 Opp."] at 3; June 4, 2015 minute order at 4.)  This is because a Korean court provides adequate remedies and permits suits involving the subject matter of the dispute.  (*See* May 11, 2015 Opp. at 3.)  Further, Defendants are all amenable to suit in Korea, and thus, Korea is an adequate alternative forum.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256-57 (1981).

Hence, the remaining inquiry is whether the inconvenience of trying this case before this Court outweighs the level of deference that should be given to Plaintiff's choice of forum.

### B.   The Private Interest Factors Favor Dismissal.

The private interest factors that courts consider when weighing the convenience of the parties include: (i) the residence of the parties and the witnesses; (ii) access to the physical evidence and other sources of proof, (iii) whether unwilling witnesses can be compelled to testify; (iv) the cost of bringing witnesses to trial; (v) the enforceability of the judgment; and "all other practical problems that make trial of a case easy, expeditious and inexpensive."  *See Lueck*, 236 F.3d at 1145-46 (*citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)).  "The district court should look to any or all of the above factors which are relevant to the case before it, giving appropriate weight to each.  It should consider them together in arriving at a balanced conclusion."  *Id.* (citations omitted).  On balance, a Korean court would be far more convenient for Defendants while Plaintiff would not be concurrently inconvenienced by litigating in its home forum.

### 1.   The Parties And Salient Witnesses Reside In Korea.

Plaintiff DFSB is a Korean corporation with its principal place of business in Korea.  (Compl. ¶ 6.)  It has four full-time employees, all of whom are based in Korea.  (Bernie Cho Rough Tr. at 20:22 – 21:9.)  It has no U.S. employees, nor does it have an office in the U.S.  (*Id.*)  Hence, DFSB would not be inconvenienced at all by trying this action in a Korean forum, where it resides.  Defendant CJ E&M

America, Inc., which is not involved in the administration of the mnet.com website or in music licensing, is based in Los Angeles.  Meanwhile, Defendant CJ E&M Corporation is located in Korea.  Therefore, the locus of the parties is clearly Korea.

What is more, Defendants' witnesses relevant to the issues actually in dispute are all located in Korea: e.g., the music-licensing team, headed by Dong-hun Lee, and the team responsible for the administration of the mnet.com website, overseen by Young-rock Pyo, all sit at CJ E&M Corporation's headquarters in Seoul.  Mr. Lee and Mr. Pyo are CJ E&M Corporation's anticipated Rule 30(b)(6) witnesses for a majority of topics that have been noticed for deposition, and their depositions are slated to proceed during the week of January 25, 2016 (Yoo Decl. ¶ 17), the same week that this motion is scheduled to be heard.  Mr. Lee will testify regarding CJ E&M's acquisition of distribution rights to Korean sound recordings, both in general practice and specifically as it relates to the songs provided to Beats Music and the music available on mnet.com.  Mr. Pyo will testify about CJ E&M's geo-fencing protocol relating to mnet.com and its efforts in confirming whether any overseas purchases had been made through the website.

Another potentially important CJ E&M Corporation witness is Ji-hye Yoon, a member of the music-licensing team who works under Dong-hun Lee.  Ms. Yoon was a key contact point on the Beats Music project, and in fact, the CJ E&M employee who actually sent the digital files of the songs, and information associated with those songs, to MediaNet.  (Lee Decl. ¶ 5.)  Ms. Yoon, who has yet to be deposed, also sits in Korea.  CJ E&M Corporation's state of mind—specifically, whether it had the intent to "induce, enable, facilitate, or conceal" a copyright infringement when it provided digital files to MediaNet to upload to the Beats Music service—is an essential element of Plaintiff's claim under section 1202 of the DMCA.  *See Gordon v. Nextel Communications*, 345 F.3d 922, 923 (6th Cir. 2003).  Ms. Yoon's testimony is therefore material to CJ E&M Corporation's ability to disprove, and conversely, DFSB's attempt to establish, a critical component of

liability.

The cost alone of bringing these three witnesses—Dong-hun Lee, Young-rock Pyo, and Ji-hye Yoon, all of whom reside in Korea—to a trial in the U.S., as well as the costs of traveling to Korea to defend their depositions, would be unfairly burdensome, especially when weighed against the actual amount in controversy. This factor therefore weighs in favor of a Korean forum.

### 2. Key Sources of Proof Are Located In Korea.

In addition to salient fact witnesses, several significant sources of physical proof are located entirely in Korea. For instance, evidence that will either confirm or disprove that persons in the United States were able to buy music from the mnet.com website during the statutory period, i.e., a payment processing database, is located at CJ E&M in Korea. Because Korean privacy laws prevent CJ E&M from transmitting that database directly overseas, a third-party hired by DFSB will have to travel on-site to verify whether any U.S. transactions occurred, and report the results to the parties. The individuals involved in that verification process, who are necessarily located in Korea, would then be percipient witnesses whose attendance could be required at trial.

Furthermore, while CJ E&M through an informal request was able to obtain preliminary information regarding what appears to be four foreign transactions that occurred through SK Planet's proprietary T store app, that database is not otherwise in the parties' control. It is controlled by SK and housed in Korea. Thus, to the extent that the parties require further discovery from SK Telecom and it is unwilling to make discovery voluntarily, the parties will have to seek relief from a court. And while it is questionable whether this Court's subpoena power would allow it to compel discovery from SK Planet in Korea, a Korean court would not face the same issue. (Yang Decl. ¶ 3.)

### 3. This Court Cannot Compel Unwilling Non-Party Witnesses.

A central issue which has presented itself during discovery is that both CJ

E&M Corporation and Plaintiff DFSB claim to hold the U.S. distribution rights to the songs that were provided to Beats Music.  Establishing who held what rights, if any, during which periods, if ever, will therefore be critical to determining liability. The witnesses that could shed the most light on that issue, however, all reside in Korea and likely outside the subpoena power of this Court.

Under Korean contract law, a transfer of a copyright does not have to be in writing.[2]  (*Id.* at ¶ 4.)  Furthermore, a grant of rights can be rescinded unilaterally, even simply verbally, upon a breach by the other party, or by mutual agreement of the parties.  And while a grant of rights can be expressly rescinded, *ex post* conduct by the granting party inconsistent with its prior grant of rights—e.g., purporting to grant the same rights to another party—is by itself insufficient to constitute a rescission.  (*Id.* at ¶¶ 4-5.)

Because a grant or rescission of a copyright under Korean law need not be in writing, threshing out who owns what distribution rights will be as much a factual inquiry as a strictly legal one.  And while CJ E&M Corporation submits that the evidence it has acquired thus far is sufficient for this Court to determine that it, and not DFSB, held the proper distribution rights at all relevant times, to the extent this Court disagrees, this issue can only be resolved by obtaining additional discovery from witnesses who reside in Korea and are presently unwilling to (i) sit for a deposition and (ii) attend trial in this Court.[3]  By way of background:

For the songs on the "It" album by Swallow, CJ E&M Corporation acquired

---

[2]   Defendant CJ E&M America, Inc.'s April 29, 2015 motion to dismiss contained the uncited proposition that "under both U.S. and Korean copyright law, a transfer of an interest in copyright must be in a signed writing. [Cite.]" (Dkt. No. 13 at 18 n.12.)  While it is true under U.S. copyright law that a transfer of a copyright be in a signed writing, there is apparently no analogous requirement under Korean law. Defendants regret the error.

[3]   Indeed, if it were otherwise, the instant motion would be one for summary adjudication instead.

1   the U.S. distribution rights through a licensing agreement between CJ E&M

2   Corporation's predecessor in interest and Swallow's record company, Sha Label.

3   That agreement is dated October 1, 2008 and is governed by Korean law.  (Yoo

4   Decl. Exh. L.)  On the other hand, DFSB claims it has U.S. distribution rights based

5   on an agreement between it and Sha Label dated December 23, 2014 that purports to

6   amend an earlier agreement between those parties dated November 26, 2008.[4]  (*Id.*

7   Exhs. F, G.)  This means that, at a minimum, there are competing claims to the U.S.

8   distribution rights to the "It" album, ███████████████████████████

9   ████████████████████████████

10       Here, the validity of the October 1, 2008 agreement by which CJ E&M

11   Corporation acquired its rights cannot be reasonably disputed.  Further, DFSB has

12   not adduced evidence that the grant of rights was ever rescinded or that the term of

13   the agreement was otherwise ever ceased.  Moreover, under Korean law, the

14   subsequent purported grant of rights to DFSB in December 2014 (or in November

15   2008 for that matter, to the extent DFSB relies on that date) could not have served as

16   a rescission of CJ E&M's rights, which remain valid and in full effect.

17       In fact, CJ E&M Corporation has obtained a verified witness statement from

18   Sha Label's CEO, Gi-yong Lee, aka, Swallow, confirming that "Sha Label has not

19   terminated the contract on distribution of album and music dated October 1, 2008

20   with current CJ E&M."  (*Id.* Exh. I ["August 10, 2015 statement"] at 2.)  In that

21   same notarized witness statement, Mr. Lee disavows DFSB's sham December 23,

22   2014 agreement, declaring that he was neither aware of it ("I had no knowledge of

23   the fact that the above addendum to the contract was signed") nor had he authorized

24   anyone to sign it on Sha Label's behalf ("since DFSB's supplementary agreement

---

25

26   [4]   Notably, DFSB has not claimed the earlier November 26, 2008 priority date;
     rather, the earliest date for which it claims to have obtained the U.S. distribution

27   rights for the "It" album is in fact December 23, 2014.  (Yoo Decl. Exh. J ["DFSB's

28   Rog Responses"] at 13, 22-23.)

1   was executed without my knowledge and was signed by So-young Lee, who didn't

2   have agency authority, Sha Label cannot acknowledge the supplementary

3   agreement."). (*Id.* at 2-3.)

4       Mr. Lee has not agreed to sit for a deposition voluntarily. And since Gi-yong

5   Lee is a Korean national residing in Korea, the parties cannot compel further pre-

6   trial evidence from him through the Hague Evidence Convention. *See generally* 23

7   U.S.T. 2555, Art. 23. Furthermore, it is questionable whether this Court's subpoena

8   power would extend so far as to ensure Mr. Lee's attendance at trial. A Korean

9   court, on the other hand, would face no such issues in compelling evidence from

10  unwilling third parties residing in Korea, such as Gi-yong Lee. (Yang Decl. ¶ 3.)

11  This is a factor that favors dismissal, since the relative availability of compulsory

12  process to compel the attendance of significant unwilling witnesses at trial is

13  considered the most important private interest factor. *See Howe v. Goldcorp Invest.*

14  *Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (because "only Canadian courts, and not

15  courts within the United States, have the legal power to compel testimony of twelve

16  Canadian potential witnesses who are not under the control of either party" the

17  private interests weighted heavily in favor of dismissal).

18      As it stands, Gi-yong Lee's witness statement is uncontroverted, and for-now

19  irrefutable, evidence that CJ E&M Corporation, and not DFSB, holds the U.S.

20  distribution rights to the "It" album. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500,

21  514 (2006) (All courts have an "independent obligation to determine whether

22  subject-matter jurisdiction exists, even in the absence of a challenge from any

23  party."). To the extent more evidence, namely, live testimony from Gi-yong Lee,

24  would add more clarity to this issue, it would be unduly burdensome on the parties

25  to obtain it. That burden is especially disproportionate where, as here, the royalty

26  base at issue is ███████

27      For the 10 songs from "Get On the Bus" and the 17 songs from "The Life . . .

28  DOC Blues," CJ E&M was licensed the U.S. distribution rights from a third-party

content provider in Korea, Neowiz Internet (now known as Bugs Corporation), by way of a contents supply agreement dated April 1, 2014. (Yoo Decl. Exh. M.) Under that agreement, which is governed by Korean law, Neowiz agreed to license certain music content (for which it held distribution rights) to CJ E&M on a rolling basis. The way it worked, Neowiz/Bugs granted distribution rights to certain songs and provided to CJ E&M a spreadsheet enumerating the specific songs for which it had granted licenses. That spreadsheet was updated periodically to reflect updates to the granted rights, such as additions or revisions. (Lee Decl. ¶ 8.) Additionally, Neowiz made available an online portal named NEOLIP, whereby CJ E&M employees could verify which songs—such as the songs from "Get On the Bus" and "The Life . . . DOC Blues"—had been cleared. (*Id.* at ¶ 9.) CJ E&M is not privy to complete copies of the underlying licensing agreements under which Neowiz Internet obtained the distribution rights from the artists or their record label, Buda Records.[5] Moreover, while it can access NEOLIP in Korea, that database is not in the parties' control.

Conversely, DFSB claims it has U.S. distribution rights to the above songs based on an agreement between it and Buda Records, dated December 19, 2014, that purports to amend an earlier agreement between those parties dated January 19, 2009.[6] Again, this means that, at a minimum, there are competing claims to the U.S. distribution rights to the "Get On the Bus" album, ███████████████████ ████████████████████████████████████ and the

_____

[5]   CJ E&M has been provided an excerpt of a March 24, 2006 agreement under which Buda Records granted to Neowiz Internet the distribution rights for the recordings on the "Get On the Bus" album. (April 29, 2015 Lee Declaration at ¶ 10.)

[6]   Notably, DFSB has not claimed the earlier January 19, 2009 priority date; rather, the earliest date for which it claims to have obtained the U.S. distribution rights for the "Get On the Bus" and "The Life . . . DOC Blues" albums is in fact December 19, 2014. (DFSB's Rog Responses at 12, 18-19.)

1    "The Life . . . DOC Blues" album, ██████████████████████

2    ██████

3        Here, the validity of the agreement between CJ E&M and Neowiz Internet

4    cannot be reasonably disputed.  For instance, CJ E&M Corporation has obtained a

5    verified witness statement from a director of what was formerly Neowiz Internet,

6    Joo-il Yang, confirming that the April 1, 2014 contents supply agreement between

7    Neowiz and CJ E&M is a valid agreement that has been in effect continuously since

8    its execution date.

9        The question, then, is whether the chain of title to the songs that Neowiz

10   licensed to CJ E&M is clear.  In other words, there is a potential factual issue

11   regarding whether the instruments by which Neowiz obtained the U.S. distribution

12   rights to "Get On the Bus" and "The Life . . . DOC Blues" from Buda Records have

13   been valid without interruption since their execution.  If those rights have never

14   been disturbed, as Mr. Yang has confirmed, then there is no dispute that Neowiz's

15   subsequent grant of those rights to CJ E&M was (and remains) valid.  *If*, on the

16   other hand, Buda Records had purported to rescind its license to Neowiz in the

17   intervening time, then there *potentially* could be a dispute regarding whether (i) that

18   purported rescission was valid in the first place, since a unilateral rescission is only

19   effective upon a breach by the other side; and (ii) whether it was made before or

20   after Buda Records purported to grant certain rights to DFSB.  But sorting out that

21   issue before this Court would be unduly burdensome on the parties since Buda

22   Records and Neowiz Internet, and their employees, are located in Korea and likely

23   outside this Court's subpoena power.  On the other hand, a Korean court would face

24   no issues in compelling witness testimony or documents from Buda Records and

25   Neowiz Internet.  (Yang Decl. ¶ 3.)

26       Again, Defendants submit that they have adduced sufficient evidence for this

27   Court to determine that CJ E&M Corporation, and not DFSB, held the appropriate

28   distribution rights to "Get On the Bus" and "The Life . . . DOC Blues" during the

1   relevant periods.  To the extent more evidence, namely, live testimony or documents

2   from representatives of Neowiz or Buda Records, would add more clarity to that

3   issue, it would be unduly burdensome on the parties to obtain it.  That burden is

4   especially disproportionate where, as here, the royalty base at issue is ███████

5   ███████████████████████████████████

6       Therefore, as Defendants have demonstrated, the balance of the private

7   interest factors tips significantly in favor of a Korean forum.

8           **C.      The Public Interest Factors Favor Dismissal.**

9       In determining whether trying a matter would be inappropriately

10  inconvenient, courts consider the following public interest factors: (i) local interest

11  of the lawsuit; (ii) avoidance of unnecessary problems in conflicts of laws, or in

12  application of foreign laws; (iii) burden on local courts and juries; (iv) congestion in

13  the court; and (v) the costs of resolving a dispute unrelated to this forum.  *See Lueck*,

14  236 F.3d at 1147.  The public interest factors weigh against resolving this dispute

15  before this Court.

16          **1.      The Local Interest In this Lawsuit Is Minimal.**

17      As an initial matter, the local interest in the subject matter of this action is

18  infinitesimally slight, as underscored by the trivial amount in royalties that CJ E&M

19  has received from the songs it provided to Beats Music: ███████████   What is

20  more, ████████████████████████████████████

21  ████████████████████████████████████

22  ███████████   (DFSB's Rog Responses at 15.)  In other words, the public's

23  interest in this lawsuit's subject matter is extremely low, as established empirically.

24      Moreover, there is no local interest in trying this case before this Court

25  insofar as Plaintiff's claims are based on acts that must have occurred, if at all,

26  entirely in Korea concerning Korean sound recordings, the distribution rights of

27  which are governed by Korean law.  As such, this is essentially a dispute between

28  two Korean companies over Korean property rights, a fact that favors dismissal:

This is essentially a dispute between two [foreign] corporations as to which of them was the original developer of the disputed [intellectual property.] ***This is not a case involving the piracy of American made products or substantively involving American companies.*** As such, the United States' interest in resolving this controversy and the relation of the jury community to this controversy are extremely attenuated and do not sway the balance against dismissal. The presence of [a wholly-owned American subsidiary as a defendant], influences our analysis very little.

. . .

'[U.S.] copyright laws do not serve this purpose of protecting consumers. They are designed to protect the property rights of copyright owners.' As such, the key interest in this dispute lie with the [foreign] corporations, not the American public.

*Creative Technology*, 61 F.3d at 704 (emphasis added).

Meanwhile, the local Korean interest in resolving this dispute is strong. The primary alleged tortfeasor is a Korean corporation, the largest media and entertainment conglomerate in the country. Plaintiff is also a Korean company and it is suing based on a claimed ownership interest in Korean sound recordings. In fact, there has already been significant media coverage in Korea concerning this lawsuit. (Yoo Decl. Exh. K.) By way of example, two of the most widely circulated English-language publications in Korea—the Korea Herald and the Korea Daily—ran stories about this lawsuit, focusing on CJ E&M Corporation's stature as Korea's "largest entertainment and media company." (*Id.*) Hence, a Korean court has the strongest local interest in resolving this dispute involving one of its biggest companies over issues concerning primarily Korean law.

## 2.     This Court Will Have To Apply Korean Law.

Since the works at issue were recorded and published in Korea, this Court will need to apply Korean law as it relates to the copyrights, and specifically the distribution rights, in those works. "Initial ownership of a copyrighted work is determined by the laws in the work's country of origin . . . ." *See Lahiri v. Universal Music & Video Dist.*, 513 F. Supp. 2d 1172, 1176 n.4 (C.D. Cal. 2007) ("Because [the work at issue was created in a foreign country], that country's

1 copyright laws are applied to determine initial ownership."). Here, the songs at
2 issue were all recorded in Korea, and thus, issues pertaining to their ownership are
3 governed by Korean law. (June 4, 2015 minute order at 4.)

4      This includes specifically whether any purported assignment of rights was
5 effective when made and whether it remains valid. And as discussed *supra*, because
6 a grant or rescission of a copyright under Korean law need not be in writing,
7 determining the underlying ownership interests could involve the application of
8 Korean law to facts that are not available (and otherwise not readily obtainable) to
9 this Court, which could very well lead to a decidedly different result than if this
10 action were before a Korean court. The necessity to avoid precisely this type of
11 scenario is a factor that militates in favor of dismissal.

12      Furthermore, this Court will need to interpret the scope and effect of the
13 release language contained in the 2012 Korean settlement agreement under Korean
14 law. In considering the effect of that settlement agreement while deciding CJ E&M
15 America's prior motion to dismiss, this Court was led askance by Plaintiff's
16 mischaracterization of the 2011 Korean litigation. To be clear, *some* of the claims in
17 the earlier litigation involved a contract under which CJ E&M licensed music
18 content to DFSB. DFSB claimed that CJ E&M had breached the contract since it
19 allegedly did not hold the underlying rights that it had purported to grant. But that
20 contract *did not* concern any of the 303 songs at issue in this action. *Separate and*
21 *apart* from that breach-of-contract claim, DFSB further alleged that CJ E&M had
22 illegally distributed music, specifically 3,947 songs including the 303 songs
23 presently at issue, through the mnet.com website without permission. (2012 Korean
24 settlement order at 10-11; Bernie Cho Rough Tr. 200:2-200:4.) This is identical to
25 DFSB's claim in this action that CJ E&M has improperly distributed music on
26 mnet.com. (*Id.*) Thus, there is significant overlap between the claims asserted (and
27 thereafter released) in the earlier 2011 Korean litigation and the claims asserted
28 here, and a court must determine whether the earlier release language covers the

latter.  On the one hand, DFSB contends that the release language should be narrowly interpreted to cover only the breach-of-contract claims previously asserted, whereas CJ E&M's position is obviously that the release was intended to be and is much broader.

In deciding who is correct, a court will have to examine the release language, written in Korean, and determine what preclusive effect it should carry under Korean law.  To the extent that a court finds an ambiguity in the Korean-language release, it would presumably turn to extrinsic evidence to divine the intent of the contracting parties.  Again, that determination could be decidedly different before this Court as compared to a Korean court, a factor that points towards dismissal.

### 3.    It Is A Waste Of Resources To Try This Matter Here.

It would be a waste of resources to ask local citizens to serve on a jury for a matter that is so unrelated to this forum.  Again, the royalty base at issue here is ███ that was paid to CJ E&M Corporation (none of which was paid to CJ E&M America), which should be *per se* evidence that this matter lacks significant local ties.  Indeed, it would not serve the public interest to tie up judicial resources to determine which of two Korean companies is entitled to ███ in royalties when that question can be more conveniently decided elsewhere, namely Korea.  Moreover, it would be a waste of resources to ask the citizens of this District, who very clearly have no interest in the matter, to hear a case that has only specious ties to this forum in the first place.

In sum, the balance of the public interest factors weighs heavily in favor of a Korean forum, which is the least-cost avoider of trying this dispute.

### D.    Plaintiff's Choice Of Forum Should Be Given Minimal Deference.

As a foreign party, DFSB's choice of a U.S. forum is entitled to less deference.  The attendant showing that Defendants must make on the convenience factors, then, is also much less.  *Piper Aircraft*, 454 U.S. at 256.  This is because when a foreign plaintiff chooses to sue in the U.S., "such choice is entitled to less

1   deference because one may not easily presume that choice is convenient." *Pollux*

2   *Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003). "In such

3   circumstances, it is more likely that forum-shopping for a higher damage award or

4   some other litigation advantage was the motivation for plaintiff's selection.  Even

5   absent those forum shopping considerations, there still is no reason to assume a U.S.

6   forum is convenient for a foreign plaintiff's suit." *Id.*

7        Here, Plaintiff has all but admitted to forum shopping for a U.S. forum over a

8   Korean forum so that it could maximize its potential recovery.  Indeed, this is not a

9   case in which a company is earnestly defending its property rights, but one

10  involving copyright trolling at its worst.  The genesis of this suit, and the timeline

11  leading up to it, is telling.

12       DFSB's Bernard Cho first contacted MediaNet in July 2014 because he

13  noticed that certain songs, including the "It"; "Get On the Bus"; and "The Life . . .

14  DOC Blues" albums, were available for streaming on Beats Music.  Some *five*

15  *months later* in December 2014, at the direction of his current litigation counsel,

16  DFSB purported to obtain the "exclusive" U.S. distribution rights to those albums so

17  that he could bring the present lawsuit.  (Bernie Cho Rough Tr. 153:2-16.)  In other

18  words, DFSB set out to sue CJ E&M even before it had what it thought was a

19  lucrative pathway to do so.  Mr. Cho even admitted as much at his recent deposition:

20       Q.    So the execution of this [licensing agreement with Buda

21       Records] postdates your first contact with the Browne George Ross law

22       firm in relation to this lawsuit?

23       A.    . . . I was working with Browne George Ross prior to this

24       agreement being drafted and that's as far as I should answer, I think.

25       . . .

26       Q.    Just out of curiosity again with the same caution approximately

27       when did you decide to bring the current lawsuit?

28       A.    I don't recall the exact date in terms of when I decided to pursue

1  this lawsuit so I can't give you a particular date.

2      Q.      Was it sometime before July 2014?

3      A.      To my recollection it was before July 2014.

4  (Bernard Cho Rough Tr. at 153:7-13; 154:8-15.)

5      And in fact, this insidious tactic was merely the culmination of a plan that

6  DFSB had hatched years earlier. ███████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████

10 ████████████████████████████ Put differently, DFSB sued Defendants in this

11 Court instead of in Korea for the *stated purpose* of vexing Defendants with

12 oppressive logistical burdens and the specter of the enhanced damages available

13 under a U.S. statutory scheme.

14     Fortunately, this Court need not and should not abide Plaintiff's blatant forum

15 shopping.  Instead, it should accord the appropriate level of deference to Plaintiff's

16 choice of forum—i.e., none to very little—and weigh that against the enormous

17 burden of trying this matter here.  Because the inconvenience to the parties and the

18 public is staggeringly disproportionate to Plaintiff's calculated choice of a forum

19 away from its home, this Court can in its prudence dismiss this case in favor of a

20 Korean court.

21 **IV.   CONCLUSION**

22     This Court should not abide Plaintiff's forum shopping.  As Defendants have

23 established, the parties, this Court, and the public would be oppressively burdened

24 by having to try this case here.  Therefore, this Court should dismiss this lawsuit in

25 its entirety so that it can be refiled in a Korean court.

26

27

28

1 | DATED:  December 28, 2015            Respectfully submitted,

2

3                                        Ekwan E. Rhow
                                         Timothy B. Yoo
4                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                         Drooks, Lincenberg & Rhow, P.C.
5

6                                        By:    _____/s/ *Timothy Yoo*_____

7                                                    Timothy B. Yoo
                                         Attorneys for Defendant
8                                        CJ E&M Corporation and CJ E&M
                                         America, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28