1  BROWNE GEORGE ROSS LLP
   Eric M. George (State Bar No. 166403)
2    egeorge@bgrfirm.com
   Keith Wesley (State Bar No. 229276)
3    kwesley@bgrfirm.com
   Andrew A. August (State Bar No. 109741)
4    aaugust@bgrfirm.com
   Jonathan Gottfried (State Bar No. 282301)
5    jgottfried@bgrfirm.com
   2121 Avenue of the Stars, Suite 2400
6  Los Angeles, California 90067
   Tel 310.274.7100  -- Fax 310.275.5697

7
   Attorneys for Plaintiff
8  DFSB Kollective Co. Ltd.

9                  UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12 DFSB KOLLECTIVE CO. LTD., a          Case No. 2:15-cv-01650-SVW-FFM
   Korean corporation;                   Assigned to The Hon. Stephen V. Wilson
13
                                         **REDACTED PLAINTIFF DFSB**
14          Plaintiff,                   **KOLLECTIVE CO. LTD'S**
                                         **OPPOSITION TO DEFENDANTS'**
15      vs.                              **MOTION TO DISMISS**
                                         **PLAINTIFF'S COMPLAINT**
16 CJ E&M, INC., a Korean corporation;   **BASED ON *FORUM NON***
   CJ E&M AMERICA, INC., a California    ***CONVENIENS***
17 corporation,
18          Defendants.
                                         Date:    January 25, 2016
19                                       Time:    1:30 PM
                                         Crtrm.:  6
20

21

22

23                 **REDACTED VERSION OF DOCUMENT**

24

25

26

27

28

588858.1

# **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................. 1

II.    BACKGROUND ............................................................................. 3

    A.  Defendants' Distribution of Music to the United States via
        www.mnet.com ..................................................................... 3

    B.  Defendants' Distribution of Music to the United States via Beats .......... 6

III.   ARGUMENT ................................................................................. 7

    A.  The Court Should Not Dismiss This Case on the Ground of
        *Forum Non Conveniens.* ....................................................... 7

        1.  The Late Stage of This Case Weighs Against Dismissal. ............. 8

        2.  The Private Interest Factors Weigh Against Dismissal or
           Are Neutral. ....................................................................... 9

           a.  The Residences of the Parties and Witnesses Do Not
              Favor Dismissal. .................................................. 9

              (i)   The Parties' Residences Are in the United
                  States and Korea. ...................................... 9

              (ii)  The Majority of the Expert Witnesses Are
                  Located in the United States. ................................. 13

              (iii) Numerous Non-Party Witnesses Are Located
                  in the United States. ................................................. 14

              (iv) Witnesses of CJ E&M America Are in the
                  United States. ........................................................... 15

              (v)  The United States Is Convenient for the
                  Witness of DFSB. ................................................... 15

               (vi)  Witnesses in Korea. ................................................ 15

            b.  A 2012 Settlement Order Does Not Favor Dismissal. ...... 16

           c.  The Forum's Convenience to the Litigants Does Not
              Favor Dismissal. .................................................. 20

            d.  Access to Physical Evidence and Other Sources of
              Proof Does Not Favor Dismissal. ....................................... 20

            e.  Whether Unwilling Witnesses Can Be Compelled to
              Testify Does Not Favor Dismissal. ................................... 21

# TABLE OF CONTENTS
## (Cont'd)

**Page**

f. The Cost of Bringing Witnesses to Trial Does Not Favor Dismissal. ................................................. 22

g. The Enforceability of the Judgment Does Not Favor Dismissal. .......................................................... 22

h. An Efficient Resolution of This Dispute Does Not Favor Dismissal. .......................................................... 23

3. The Public Interest Factors Do Not Favor Dismissal. ................. 23

a. The Local Interest in the Lawsuit Does Not Favor Dismissal. .......................................................... 23

b. The Court's Familiarity with the Governing Law Does Not Favor Dismissal. ............................................... 24

c. The Burden on Local Courts and Juries Does Not Favor Dismissal. .......................................................... 25

d. Congestion in the Court Does Not Favor Dismissal. ........ 25

e. The Costs of Resolving a Dispute Unrelated to a Particular Forum Does Not Favor Dismissal. ................... 25

IV. CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Andreola v. State of Wis.,*
  No. 04-C-0282, 2006 WL 897787 (E.D. Wis. Apr. 4, 2006) ................................... 8

*Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.,*
  940 F. Supp. 554 (S.D.N.Y. 1996) ...................................................................... 22

*Balsam v. Tucows Inc.,*
  627 F.3d 1158 (9th Cir.2010) ............................................................................... 4

*F. W. Woolworth Co. v. Contemporary Arts,*
  344 U.S. 228 (1952) ............................................................................... 2, 23, 24

*HMS Stores, LLC v. RGM Distribution, Inc.,*
  No. 2:14-CV-09730-SVW-E, 2015 WL 1299750
  (C.D. Cal. Mar. 3, 2015) ....................................................................................... 4

*In re Apple Inc.,*
  456 F. App'x 907 (Fed. Cir. 2012) ........................................................................ 8

*In re Sik Choi v. Hyung Soo Kim,*
  50 F.3d 244 (3d Cir. 1995) .................................................................................. 23

*Javaheri v. JPMorgan Chase Bank, N.A.,*
  No. CV10-08185 ODW FFMX, 2011 WL 97684
  (C.D. Cal. Jan. 11, 2011) ....................................................................................... 3

*King.com Ltd. v. 6 Waves LLC,*
  No. C-13-3977 MMC, 2014 WL 1340574 (N.D. Cal. Mar. 31, 2014) ................. 25

*Nat'l Shopmen Pension Fund, v. Stamford Iron & Steel Works, Inc.,*
  999 F. Supp. 2d 229 (D.D.C. 2013) ................................................................ 21, 22

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
  134 S. Ct. 1962 (2014) ........................................................................................ 20

*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981) ............................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

*Ravelo Monegro v. Rosa,*
    211 F.3d 509 (9th Cir. 2000) .............................................................. 10

*Samyang Food Co. v. Pneumatic Scale Corp.,*
    No. 5:05-CV-636, 2005 WL 2711526 (N.D. Ohio Oct. 21, 2005) ...................... 23

*Sildack v. Corizon Health, Inc.,*
    No. 11-12939, 2014 WL 4855004 (E.D. Mich. Sept. 30, 2014) ............................ 8

*Zamora-Garcia v. Moore,*
    No. CIV.A. M-05-331, 2006 WL 3341034 (S.D. Tex. Nov. 16, 2006) .................. 8

## FEDERAL STATUTES

17 U.S.C.
    § 501 .................................................................................................... 24
    § 507(b) ............................................................................................... 18
    § 1202 .................................................................................................. 24

28 U.S.C.
    § 1781 .................................................................................................. 22

## RULES

Fed. R. Civ. P.
    26(a) .......................................................................... 13, 15, 16, 17

Fed. R. Evid.
    201 ........................................................................................................ 4
    803(8)(iii) ............................................................................................. 3

Local Rules
    Rule 37-2.1 ............................................................................................ 5
    Rule 83-6.3.2 ........................................................................................ 22

## OTHER AUTHORITIES

*Wright, Miller, & Kane,* 15 Federal Prac. & Proc. § 3844 (4th ed. 2013) ............... 1, 8

# I.     INTRODUCTION

Defendants have moved to dismiss this case based on *form non conveniens* shortly before trial. At this point:  (1) the parties have produced and reviewed over 12,000 pages in discovery and responded to over seventy-five interrogatories and requests for admission, (2) counsel have taken depositions of plaintiff and defendant CJ E&M America's 30(b)(6) representatives, (3) discovery has been conducted on four non-parties, resulting in tens of thousands of pages of evidence (and requiring, in some instances, motions to compel), and (4) reports by experts (most of whom are in the United States) have been exchanged.  Defendants' delay weighs strongly against dismissal. *See Wright, Miller, & Kane,* 15 Federal Prac. & Proc. § 3844 (4th ed. 2013) ("[I]t is common sense that the party seeking a change of venue should act with reasonable promptness and that delay may cause the district court to refuse a transfer that otherwise would have been granted had it been sought earlier." (citing numerous cases)).

Even if defendants had not unreasonably delayed, their motion would still be unavailing.  Discovery has revealed that:

- Defendants used the site mnetamerica.com—a website registered to defendant CJ E&M America in Los Angeles—to allow American consumers to access mnet, from which Americans could purchase the songs at issue. Defendants claim that technological measures (geo-fencing) blocked consumers outside of Korea from downloading or streaming music from mnet.com.  But plaintiff's expert, after analyzing the code for the website, discovered holes in defendants' system that enabled IP addresses from outside of Korea to complete transactions on the website.  Furthermore, defendants have allowed consumers to use American credit cards to purchase music on mnet.com, allowed Americans to register on mnet.com, and offered an English-language membership sign-up page and an English-language user agreement.  Contrary to defendants' assertion, mnet.com was not a website limited to Korean consumers.

- The Chief Operating Officer of defendant CJ E&M America in Los Angeles was integral to defendants' offering of certain sound recordings at issue on the Beats music platform, which was based in Los Angeles and available only to American consumers.  The COO met with Beats officials in Los Angeles regarding defendants' distribution of music on the platform, was involved in promoting the distribution, and was repeatedly involved in communications regarding the delivery of the sound recordings to Beats.

1    In favor of dismissal, defendants argue that:  (1) damages are *de minimis*, (2) a

2   Korean settlement order precludes this action, and (3) witnesses in Korea could not

3   be compelled to testify.  None of these arguments has merit.

4    *First,* defendants cite no case law that a case should be dismissed on grounds

5   of *forum non conveniens* when actual damages in a copyright suit fall below a certain

6   threshold.  Furthermore, defendants have obscured the actual damages by claiming

7   that:  (1) they do not keep records of the physical location of members of their web-

8   site (although this information is requested of users during registration), and

9   (2) Korean privacy law prevents the disclosure of addresses of consumers of the

10   songs at issue.  Under such circumstances—where profits from infringement have

11   been rendered difficult to determine—statutory damages are proper.  *See F. W.*

12   *Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 231 (1952) (statutory damages

13   are intended to allow "owner of a copyright some recompense for injury done to him,

14   in a case where the rules of law render difficult or impossible proof of damages or

15   discovery of profits").  In this case, these statutory damages are sizable, with maxi-

16   mum, non-willful infringement amounting to over $10 million.

17    *Second*, a 2012 Korean settlement order among the Korean parties cannot

18   foreclose this action for several reasons.  Foremost among these is that the Korean

19   complaint underlying that action was filed in 2011 and necessarily involved conduct

20   that pre-dated its filing.  In contrast, this lawsuit involves conduct that post-dates

21   March 2012, as required under the Copyright Act's three-year statute of limitations.

22    *Third*, defendants could have compelled testimony of Korean witnesses under

23   the Hague Convention.  Their choice not to do so does not justify dismissal.

24    Consequently, the Court should again deny defendants' motion, which seeks

25   dismissal of this case so that a Korean court can apply American copyright law to

26   determine whether a Los Angeles-based defendant:  (1) falsified copyright informa-

27   tion via a California company (Beats Music), and (2) infringed recordings registered

28   with the U.S. Copyright Office by distributing them for the American public.

## II.    BACKGROUND

### A.    Defendants' Distribution of Music to the United States via www.mnet.com

While defendants devote much of their brief to discussing the parties' dispute over 36 songs, there are a total of 303 songs at issue—all of which were distributed via mnet.com. (Ex. 1 at Response to Rog No. 8 to Declaration of Jonathan Gottfried ("Gottfried Decl.")) For the majority of these songs (267 of them), defendants have failed to present any evidence to contradict DFSB's claim that it has the exclusive right (via English-language license agreements) to distribute them in the United States. (Ex. A to Declaration of Bernie Cho ("Cho Decl.")). There are no questions of Korean law regarding these songs:  the only issue is whether defendants distributed this music via mnet.com to the United States in violation of the Copyright Act.

Mnet.com is a website administered by defendant CJ E&M, Inc. to promote and distribute media, including music. (Answer (Dkt. Nos. 26 & 27) ¶ 30) In 2011, an audit conducted by the Korean government concluded that "CJ E&M used one of its subsidiary websites, Mnet.com, to permit foreign users to obtain membership and sold music illegally for over 3 years."[1] (Ex. B to Cho Decl. at DFSB001178) In the wake of the Korean government's criticism, defendants claimed that mnet.com was now being offered only to individuals located in Korea. Since the Korean government investigation, when users located in the United States have typed "mnet.com" into their browser, they have been re-directed to mnetamerica.com. (Ex. 2 to Gottfried Decl. at 30:3-6)) According to CJ E&M America's Chief Operating Officer ("COO"), this is because defendants do not have "the rights to sell music internationally" via mnet.com. (*Id.* at 32:11-12)

---

[1] The Court may take judicial notice of a government report. *See, e.g., Javaheri v. JPMorgan Chase Bank, N.A.*, No. CV10-08185 ODW FFMX, 2011 WL 97684, at *2 (C.D. Cal. Jan. 11, 2011) (citing cases). *See also* Fed. R. Evid. 803(8)(iii) (providing exception to hearsay rule for public records that constitute "factual findings from a legally authorized investigation").

1    But as CJ E&M America's COO acknowledged during her deposition, fans of

2  K-Pop music in the United States have "tremendous interest" in purchasing music

3  from mnet.com. (Ex. 2 to Gottfried Decl. at 32:4-13)   Consequently, CJ E&M

4  adopted alternative ways of making mnet.com available to users outside of Korea

5  (including those in the United States) by using another website:

6  www.mnetamerica.com.

7    The registrant, administrator and technical contact for mnetamerica.com is a

8  CJ E&M America employee located in Los Angeles. (Ex 24 to Gottfried Decl. &

9  Ex. 2 to Gottfried Decl. at 23:11-17)[2]   CJ E&M America is responsible for creating

10  and uploading the content on mnetamerica.com.  The primary purpose of

11  mnetamerica.com is to promote Korean media in the United States, including "a

12  significant amount of Korean music." (Ex. 2 to Gottfried Depo. at 21:3-7; 21:17-20,

13  23:6-10)  Since December 2013, CJ E&M America has used mnetamerica.com to

14  cultivate a Korean pop music fan base in the United States. (*Id.* at 112:9-19)

15    In at least 2014, the front page of mnetamerica.com had a link to mnet.com.[3]

16  From that link, American consumers could access mnet.com. (Ex. 2 to Gottfried

17  Decl. at 28:6-8)  In other words, American consumers who typed "mnet.com" into

18  their browsers were directed to the front page of mnetamerica.com (enabling

19  defendants to maintain the appearance of blocking American consumers from their

20  website); but the front page of mnetamerica.com contained a link back to mnet.com.

21    When asked whether American consumers who clicked on the "mnet" link on

22

23  [2] Under Fed. R. Evid. 201, the Court may judicially notice the registration record for
   the domain name, mnetamerica.com, which is a matter of public record available at

24  https://whois.icann.org/en/lookup?name=mnetamerica.com. *See HMS Stores, LLC v.
   RGM Distribution, Inc.,* No. 2:14-CV-09730-SVW-E, 2015 WL 1299750, at *2 n.1

25  (C.D. Cal. Mar. 3, 2015)  (taking judicial notice of registration record for domain
   name). *See also Balsam v. Tucows Inc.,* 627 F.3d 1158, 1159 (9th Cir.2010)

26  ("ICANN is a private, non-profit corporation that administers the registration of
   internet domain names.").

27  [3] Ex. 3 to Gottfried Decl. (authenticated at Ex. 2 to Gottfried Decl. at 26:5-7) at p.3 &
   Ex. 4 to Gottfried Decl. (authenticated at Ex. 2 to Gottfried Decl. at 31:9-12 at p.3)

28

mnetamerica.com "would have access to both TV and music" on mnet.com, CJ E&M America's COO responded: "you would have the potential to access it." (Ex. 2 to Gottfried Decl. at 29:22-30:2)   When asked whether U.S. consumers clicking on that link could stream music from mnet.com, CJ E&M America's COO responded, "[p]otentially." *Id.* at 28:24-29:5.

The ability of consumers outside of Korea to access music from mnet.com was more than a potentiality.  Defendants claim that music on mnet.com can only be purchased through "Korean IP addresses." (Declaration of Young-Rock Pyo in Support of Defendants' Motion ¶ 4)  That is false.  Plaintiff's computer expert has determined that purchases on mnet.com can be completed by IP addresses outside of Korea.[4]  (Declaration of Ellis Horowitz in Opp. to Defs.' Motion ¶ 4)   And defendants admit in their motion that there are other instances of users from outside of Korea purchasing the songs at issue.  (Defs.' Memo. at 5:25-6:16)  Defendants fail to explain how these instances are possible in light of their purported technical obstacles.

Moreover, since March 2012, mnet.com has allowed consumers to use American credit cards to purchase music on mnet.com.   (Ex. 5 to Gottfried Decl. at Response to RFA No. 50) (admitting that consumers on mnet.com could "pay for music with a credit card issued overseas")).  Likewise, since March 2012, mnet.com has offered an English-language membership sign-up page and an English-language user agreement.  (*Id.* at Response to RFA Nos. 47 & 48)  Defendants have also allowed persons located outside of Korea to become members of mnet.com.  (*Id.* at Response to RFA No. 49)[5]

---

[4]   Defendants have resisted providing additional computer code from mnet.com that would enable plaintiff  to determine the extent of the problems—a topic that is currently the subject of a L.R. 37-2.1 stipulation.
[5]   Defendants feign ignorance of American access to mnet.com.  When asked in an interrogatory to identify users of mnet.com who have physical addresses in the United States, defendants responded "physical addresses of mnet.com subscribers/users are no longer requested or kept." (Ex. 1 to Gottfried Decl. at Response to Rog. (footnote continued)

1  Contrary to defendants' story, defendants are using mnet.com to distribute
2  sound recordings outside of Korea, including to the United States.

3  **B.  Defendants' Distribution of Music to the United States via Beats**

4  Thirty-seven of the songs at issue in this case were distributed by Beats—a
5  music service available to consumers in the United States but not in Korea.  (Answer
6  (Dkt. Nos. 26 & 27) ¶ 23)  Defendants aspired to be the exclusive provider of Korean
7  music to Beats and to "handl[e] all the licensing of the music, Korean music, into the
8  service." (Ex. 2 to Gottfried Decl. at 58:11-15)

9  Defendants sought to upload their Korean music to Beats around the time of
10  Beats' launch in early 2014.  *See* Ex. 2 to Gottfried Decl. at 54:21-23 (deposition
11  testimony of CJ E&M America's COO that we "wanted to launch as soon as possible
12  with the general launch of Beats Music.  Beats Music, I believe, launched…in
13  January of 2014.").   But defendants were ill-prepared  for this task.  As CJ E&M
14  America's Chief Operating Officer testified, "the plan was to launch February.  And
15  we found ourselves still getting updates on licensed music later on. …..I jumped in
16  and I said, listen, I don't think we are ready." (Ex. 2 to Gottfried Decl. at 53:20-54:5)

17  In February 2014, defendants were uploading large volumes of K-Pop music
18  to Beats.[6]  They were in a rush to upload millions of more songs.[7]  In their haste to
19  make available millions of K-Pop songs to American consumers, defendants neglec-
20  ted to confirm that they had distribution rights in the United States.  Defendants

21  ─────────────────────
No. 7)
22  [6] Ex. 6 to Gottfried Decl. at CJA0000056  (email from CJ E&M employee to Beats in
February 2014: ███████████████████████████████████████████████████
23  ██████████████████████████████████████████████████████████████
)
24  [7] Ex. 6 to Gottfried Decl. at CJA0000055  (email from CJ E&M employee to Beats in
March 2014: "████████████████████████████
25  ████████████████, *id.* at CJA0000053 (email from CJ E&M employee to
26  Beats music, complaining that ████████████████████████  CJA0000086
(email from Beats to defendants: "████████
27  ████████████████████.").)

28

1   adopted an upload-first, ask-later approach to distributing Korean music in the

2   United States.  For example, in January 2014, ██████████████████████

3   ████████████████████████████████████████

4   ██████████████████[8]  Then, in early March 2014, defendants ██

5   ████████████████████████████████████.[9]

6   Two weeks later (on March 18, 2014), defendants emailed MediaNet: "███

7   ████████████████████████."  (Ex. 6 to Gottfried Decl. at

8   CJA0000051)  Defendants claimed to have subsequently contacted the

9   artists/management companies and obtained the necessary approvals.  *Id.*  But, in

10  fact, numerous, major music companies refused to allow defendants to distribute

11  their music via Beats.[10]

12  **III.   ARGUMENT**

13      **A.   The Court Should Not Dismiss This Case on the Ground of *Forum***

14            ***Non Conveniens.***

15      DFSB does not claim that Korea prohibits litigation on the subject matter of

16  this dispute or that a remedy in Korea would be clearly unsatisfactory.  But, as

17  discussed below, Korea is not a more appropriate forum than the United States in

18  light of the private and public-interest factors as applied to this case.

19

20

---

[8] Ex. 7 to Gottfried Decl. at CJA0000068 (email of March 17, 2014 from MediaNet
21   to defendants (including CJ E&M America) ("████████████████████
22   ██████████████████████)

23   [9] Ex. 6 to Gottfried Decl. at CJA0000054 (email of March 4, 2014 from MediaNet
24   (Beats' content provider) to defendants (including CJ E&M America): "████████
25   ████████████████████████████████████)

26   [10] Ex. 2 to Gottfried Decl. at 125:9-18 (CJ E&M America's COO's admission that
27   SM Entertainment, JYP Entertainment, YG Entertainment, and Loen Entertainment
     did not permit defendants to distribute their artists' music to American consumers via
28   Beats).



1

**1.       The Late Stage of This Case Weighs Against Dismissal.**

2       "A defendant who seeks a change of venue must act with reasonable prompt-

3   ness and if the defendant delays shortly before trial, the interest of justice in early

4   trials overcomes any convenience to the parties which might result from a change of

5   venue." *Sildack v. Corizon Health, Inc.*, No. 11-12939, 2014 WL 4855004, at *1

6   (E.D. Mich. Sept. 30, 2014). *See also Andreola v. State of Wis.*, No. 04-C-0282,

7   2006 WL 897787, at *12 (E.D. Wis. Apr. 4, 2006) ("The trial date is fast approach-

8   ing, and it is simply too late in the day to change venue."); *Zamora-Garcia v. Moore*,

9   No. CIV.A. M-05-331, 2006 WL 3341034, at *4 (S.D. Tex. Nov. 16, 2006) ("[T]he

10   Court concludes that the nearly nine month lapse of time between Insurer

11   Defendants' entrance in the case and the filing of their Motion to Transfer, in

12   addition to the delay and waste of judicial resources that may result if transfer is

13   allowed, undoubtedly factor in the Court's overall analysis."); Wright, Miller, &

14   Kane, 15 Federal Prac. & Proc. § 3844 (4th ed. 2013) ("[I]t is common sense that the

15   party seeking a change of venue should act with reasonable promptness and that

16   delay may cause the district court to refuse a transfer that otherwise would have been

17   granted had it been sought earlier.")  Furthermore, "some reasons for transfer

18   because of convenience and fairness in regard to pre-trial proceedings such as

19   subpoena power to secure witnesses for deposition deserve less consideration so

20   close to trial." *In re Apple Inc.*, 456 F. App'x 907, 909 (Fed. Cir. 2012).

21       While defendants moved to dismiss for *forum non conveniens* at the outset of

22   this case, there is no reason for them to have waited until shortly before trial to again

23   seek dismissal.  By the time that this motion is heard, trial will be approximately one

24   month away:  on March 1, 2016.  (Dkt. No. 31)  By the time of the hearing on this

25   motion:

26   •       The parties have produced and reviewed over 12,000 pages in discovery and

27           responded to over 75 interrogatories and requests for admission (Gottfried

28           Decl. ¶ 9)

1  • Counsel have taken depositions of plaintiff and defendant CJ E&M America's
2     30(b)(6) representatives.  *Id.* ¶ 10.
3  • Discovery has been conducted on four non-parties, resulting in thousands of
4     pages of evidence and requiring, in some instances, motions to compel.  *Id.*
5     ¶ 11.
6  • Four expert reports have been exchanged.  *See* Dkt. Nos. 38 & 47.
7  • The magistrate judge will have ruled on discovery disputes.  *See* Dkt. No. 39.
8          Furthermore, if this case is dismissed, the discovery will have largely been for
9   naught.  Almost none of plaintiff's discovery on defendants could be used in an
10  action in Korea because defendants have designated almost all documents and testi-
11  mony as "highly confidential—attorneys' eyes only."  *See* Dkt. No. 40 at 2:21-22
12  ("Defendants have produced over 12,500 pages—over 90% of which have been
13  designated 'attorney's eyes only.'").  Under the protective order, plaintiff cannot
14  view this evidence, and it cannot be used outside of this litigation.  (Dkt. No. 34 ¶¶ 1,
15  7.3)  Even if plaintiff hired new counsel in Korea, they could not view the evidence
16  because evidence designated "highly confidential—attorneys' eyes only" is limited
17  to attorneys who are counsel of record in this action.  *Id.* ¶ 7.3.  Moreover, even if
18  these obstacles could be overcome, there is no indication that the kind of pre-trial
19  evidence collected here (*e.g.,* deposition testimony) could be used in any proceeding
20  in Korea.  *See* Dkt. No. 14-2 ¶ 3 (Declaration of Seung-Gon Jo ("First Jo Decl.")
21  (explaining that Korea strictly limits the use of pretrial discovery)).
22          Consequently, defendants' delay in pursuing this motion weighs against
23  dismissal.

24       **2.  The Private Interest Factors Weigh Against Dismissal or Are**
25             **Neutral.**

26           **a.  The Residences of the Parties and Witnesses Do Not**
27               **Favor Dismissal.**

28              **(i)  The Parties' Residences Are in the United States**
                 **and Korea.**

1    The strong presumption in favor of the plaintiff's choice of forum applies with

2  less force when the plaintiff is foreign. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235,

3  255 (1981)  "But less deference is not the same thing as no deference." *Ravelo*

4  *Monegro v. Rosa,* 211 F.3d 509, 514 (9th Cir. 2000) (granting deference to foreign

5  plaintiff's choice of forum).  Plaintiff DFSB is a Korean resident, and its choice of

6  forum therefore weighs somewhat against dismissal.

7    The residence of defendant CJ E&M America in Los Angeles (Answer (Dkt.

8  Nos. 26 & 27) ¶ 8) further weighs against dismissal.  While defendants attempt to

9  minimize the importance of CJ E&M America to this case, discovery belies their

10  claims.  In previously denying defendants' motion to dismiss, the Court observed

11  that "Defendants assert that…Korea has an overriding interest in resolving this

12  dispute... [But] in light of Defendants' admission that CJ E&M America has con-

13  ducted at least some activities (namely advertising) related to Beats, Defendants

14  argument is unconvincing."  (Dkt. No. 24 at pp. 5-6)  Discovery has subsequently

15  revealed CJ E&M America's extensive involvement with the alleged wrongdoing.

16    As described above, CJ E&M America was integrally involved with the

17  website mnetamerica.com, which allowed American consumers to access music on

18  mnet.com.  Furthermore, as described below, CJ E&M America's Chief Operating

19  Officer was critical to defendants' distribution of music to Americans via Beats:

20    Beats was a "curated music service."  (Ex. 2 to Gottfried Decl. at 52:11-12)

21  As described by CJ E&M America's Chief Operating Officer:  "Beats was saying,

22  'Listen, we're taking experts and experts will guide you to the music you want.'  So

23  they are asking us to put further curators or people…so that there seemed to be a

24  human being behind it promoting Korean music." *Id.* at 52:12-17. *See also id.* at

25  53:4-8 ("**Q**:….[W]as it your understanding that Beats[']…value proposition was that

26  they offered curated lists to American consumers—curated lists of music…. **A**:  That

27  was their general business model, yes.").

28    Beats therefore distributed Korean music—including the infringing music at

1    issue—to American consumers through curated lists.  *See, e.g.,* Ex. 2 to Gottfried

2    Decl. at 108:6-10 & Ex. 9 (listing DJ DOC's "Run to You," which is identified at

3    Exhibit 1 (p. 7) to plaintiff's Complaint))  CJ E&M America took the lead on

4    working on these curated lists and was involved in the creation of 30 or 40 lists, each

5    containing numerous songs.  (Ex. 2 to Gottfried Decl. at 71:15-22).  As its COO

6    explained:

> [W]e as…a corporation didn't have many of those editorial functions or
> people who would operate in that capacity.  In an odd way, I was work-
> ing with Beats here to be able to really drill down to what they were
> working for, so I could communicate that back [to] the colleagues at
> Seoul and push them to come up with ways that would be more
> appropriate for the American market, which is often my job.

*Id.* at 52:19-24.   CJ E&M America's staff analyzed the curated lists "from an

editorial perspective of…what titles look like and what would be interesting and, you

know, arouse curiosity from somebody" in the United States. *Id.* at 70:17-20.   CJ

E&M America worked closely with CJ E&M in Korea to distribute songs to

American consumers via these distribution lists.  For example, CJ E&M America's

COO provided the following testimony:

> Q:  Did [CJ] E&M Korea ever provide you with curated lists for you to
> review?  And by 'you' I mean, [CJ] E&M America?
>
> A. Yes.
>
> Q. What kinds of stuff did they ask you to review on those curated lists?
>
> A. These are ideas for the type of music lists we can put together, do
> you think these are interesting enough?  Do you find the language, you
> know, to be natural?  Does it sound like English?

(Ex. 2 to Gottfried Decl. at 70:21-71:5)

CJ E&M America's involvement in the distribution of Korean music to

American consumers was reasonable because—as its COO explained in an email

from December 2013—there was an "███████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ (Ex. 9 to Gottfried Decl. at

CJA0000360)

1    CJ E&M America's Chief Operating Officer was responsible (in her own

2  words) for "[m]aking sure that people knew that K-pop was now available for

3  streaming on Beats music in the United States." (Ex. 2 to Gottfried Depo. at 46:21-

4  47:1) She met with Beats' director of content in January of 2014 in Santa Monica in

5  order "[t]o prepare the launch of the K-pop music on the Beats Music service." *Id.*

6  at 49:18-50:18.[11]

7    CJ E&M America's COO also worked to ensure that Beats had a section

8  devoted to CJ E&M's Korean pop music:

9       They [Beats] didn't consider it [K-pop] a large enough sub-genre or
        subsection and we were—I was trying to give them a lot of information
10      through K-pop, whatnot, to promote the fact that this was worthy of
        having its own section.
11
12  Ex. 2 to Gottfried Depo. at 53:14-17.   Moreover:

13  •  CJ E&M America's COO was involved in the launch of defendants' Korean
       music on Beats.  *See* Ex. 10 to Gottfried Decl. at CJA0000367 (email from
14     Beats director of content to COO of CJA America: "███████████████

15     ███████████████████████████████████████).

16  •  CJ E&M America's COO was involved in the marketing and selling of Korean
       pop music on Beats.  *See* Ex. 11 to Gottfried Decl. at CJA0000012 (email from
17     CJ E&M America's COO to CJ E&M colleagues in Korea: "███████████

18     ████████████████████████████████████████

19     ████████████████████████████████████████

20     █)

21  •  The president as well as the chief operating officer of CJ E&M America were
       involved in communications regarding the provision of music files to Beats.

22  ────────────────────

23  [11] *See also* Ex. 10 to Gottfried Decl. at CJA0000375 (email from CJ E&M America
     employee to Beats: "████████████████████████████████████

24  ████████████████████████████.");  Ex. 23 to
     Gottfried Decl. at CJA0001054-55 (email from CJ E&M in Korea to CJ E&M

25  America's COO: "███████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  █                                                                   .").

*See* Ex. 12 to Gottfried Decl. (email from CJ E&M in Korea to the Chief Operating Office of CJ E&M America (Angela Killoren) and copying the President of CJ E&M America (Mark Shaw): "███████████████████ ██████████████████████████████████████████████████ ██████████████████████████ Ex. 10 to Gottfried Decl. at CJA0000368 (email from CJ E&M America's COO to director at Beats Music: "████████ ████████████████████████"); *id.* at CJA0000369 (email from Beats to CJ E&M America employee, Angela Killoren: ███████████ ███████████████████████████████████████████████████ ████████████).

For certain communications with Beats regarding the distribution of music, only CJ E&M America employees (not CJ E&M employees from Korea) were involved. *See, e.g.,* Ex. 9 to Gottfried Decl. at CJA0000353 (email of January 12, 2014 among Beats' employees and copying CJ E&M America's COO (Angela Killoren) regarding the "████████████████████████████").[12]

***

CJ E&M America is therefore central to this case. Consequently, while CJ E&M resides in Korea, the parties' residences, overall, weigh against dismissal.

### (ii) The Majority of the Expert Witnesses Are Located in the United States.

Three out of four of the expert witnesses designated by the parties pursuant to Fed. R. Civ. P. 26(a)(2) are located in the United States.

- Defendants designated Larry Kenswil, a California lawyer, to testify about "music distribution and digital rights." (Ex. 13 to Gottfried. Decl.)
- Defendants designated Bob Kohn, a lawyer admitted in California and New York, to testify about "royalty processing and music licensing." (*Id.*)
- Plaintiff designated Ellis Horowitz, a computer-science professor at the University of Southern California, to analyze the code for mnet.com. (*Id.*)
- Plaintiff designated Mi-Hwa Chung, a Korean lawyer, with expertise in civil law and contracts. *Id.*

---

[12] Defendants claim that "nobody at CJ E&M America was involved in…any discussion relating to…the digital files provided to Beats Music." (Defs.' Memo. at 9:1-2) Defendants' own emails belie those assertions.

-13-

### (iii) Numerous Non-Party Witnesses Are Located in the United States.

- Plaintiff issued a subpoena for documents and a deposition to MediaNet, an American company to which defendants distributed several of the recordings at issue for further distribution to the United States. (Ex. 14 to Gottfried Decl.) MediaNet produced 592 pages of relevant documents (Gottfried Decl. ¶ 18), and a 30(b)(6) representative will be deposed on January 12 (*id*.). MediaNet has relevant information regarding: (1) how and from whom they received infringing sound recordings and inaccurate copyright management information, (2) revenues paid to defendants for the infringing works, (3) how these sound recordings were further distributed to Beats and American consumers, and (4) the importance of copyright management information provided by defendants (and which plaintiff alleges to be inaccurate).

- Plaintiff issued a subpoena for documents and deposition to Beats, a California-based company that distributed several of the recordings at issue in the United States. (Ex. 15 to Gottfried Decl.) Following a motion to compel, Beats produced over 20,000 pages; and a deposition of a 30(b)(6) representative is scheduled to occur in January. (Gottfried Decl. ¶ 19) Beats has relevant information regarding: (1) how and from whom they received infringing sound recordings and inaccurate copyright management information, (2) how these recordings were further distributed to American consumers, (3) revenues provided to defendants from these infringing recordings, and (4) the importance of copyright management information provided by defendants (and which plaintiff alleges to be inaccurate).

- Plaintiff issued a subpoena for documents to The Orchard, an American company involved in digital distribution of music (including Korean music). (Ex. 16 to Gottfried Decl.) The Orchard produced agreements that raise doubts about defendants claim that Neowiz Internet granted them distribution rights in April 2014 to certain sound recordings at issue. In particular, under an agreement governed by New York law, Neowiz Internet granted to The Orchard, in July 2014, exclusive rights to distribute Neowiz's Korean catalogue in the United States. (Ex. 17 to Gottfried Decl.)

- Plaintiff issued a subpoena for documents to Akamai Technologies, a Massachusetts-based Internet company. (Ex. 18 to Gottfried Decl) According to defendants, "log-in portions of www.mnet.com are maintained through Akami Technologies." (Answer (Dkt. Nos. 26 & 27) ¶ 31) Akami should have information regarding American consumers' access to mnet.com.

- David Hurwitz is an attorney at defense counsel's firm in Los Angeles. Plaintiff identified him in its Rule 26(a) disclosures as possessing relevant information because, in 2013 (prior to this lawsuit), DFSB contacted him—as an attorney representing defendants—to notify him that plaintiff had distribution rights to several of the songs at issue. (Ex. 19 to Gottfried Decl. at p. 4) At that time, defendants did not claim to have any distribution rights in the United States to the songs at issue, and they were on notice of plaintiff's

-14-

distribution in the United States no later than 2013—and made no effort to stop plaintiff.  (Ex. C to Cho Decl.)

### (iv) Witnesses of CJ E&M America Are in the United States.

As discussed above, CJ E&M America's COO was integral to the distribution of defendants' music to Beats.  Consequently, she will be a witness at trial.

### (v)  The United States Is Convenient for the Witness of DFSB.

Bernie Cho, the head of DFSB, will be a key witness who will testify about the licensing of the music in the United States and damages caused by defendants.  He is an American citizen who regularly visits the United States.  (Cho Dec. ¶¶ 1-2)

### (vi) Witnesses in Korea.

Defendants identify three relevant witnesses from their company in Korea. (Defs.' Memo at 11:24-12:1)   Plaintiff will depose these witnesses in January.  (Ex. 20 to Gottfried Decl.)

Defendants claim that the following relevant witnesses are also in Korea: (1) Sha Label's CEO, Gi-yong Lee (Defs.' Memo. at 15:17-16:3), (2) a director of non-party Neowiz Internet, Joo-il Yang (*id.* at 18:3-8), and (3) SK Planet (*id.* at 13:18-26).  Defendants assert that they have already obtained the relevant evidence from these witnesses to defeat plaintiff's arguments. *See* Defs.' Memo. at 18:26-19:1 ("Defendants submit that they have adduced sufficient evidence for this Court to determine that CJ E&M Corporation, and not DFSB, held the appropriate distribution rights to 'Get on the Bus' and "The Life—DOC Blues' during the relevant periods."); *id.* at 16:18-20 (claiming that defendants have "irrefutable evidence that CJ E&M Corporation, and not DFSB, holds the U.S. distribution rights to the 'It' album").  Nonetheless, defendants claim that deposition testimony may "add more clarity to that issue," *id.* at 18:2-3, but they cannot compel testimony from witnesses in Korea (*id.* at 16:4-7).

1    But since defendants acknowledge that they have already obtained "irrefut-

2 able" evidence from these foreign witnesses to defeat plaintiff's claims regarding two

3 of the albums at issue, why should the Court send this case to Korea so that defend-

4 ants can obtain surplusage?   Defendants did not even disclose Mr. Lee as a relevant

5 witness in their Rule 26(a) disclosures.[13]  (Ex. 21 to Gottfried Decl.)  Furthermore,

6 as discussed above, there are important American witnesses to this case.  Conse-

7 quently, the presence of Korean witnesses does not support dismissal in light of the

8 presence of relevant, American witnesses.  This factor would therefore be a wash.

9                  **b.    A 2012 Settlement Order Does Not Favor Dismissal.**

10    Defendants argue that a 2012 settlement order between the Korean parties

11 based on an expired contract warrants dismissal of this case. (Defs.' Memo. at 7:5-

12 8:7)  That is wrong.  But, in order to understand why, details regarding that order

13 must be understood.

14    In 2011, DFSB sued CJ E&M in a Korean court.  (Ex. H to Yoo Decl.)  DFSB

15 alleged the following:

16 **Breach of Contract against CJ E&M for Sub-Licensing Distribution Rights to
Which CJ E&M Did Not Have the Rights.**

17

18 •    In 2008, CJ E&M obtained exclusive, domestic and international distribution
     rights from YG Entertainment for Korean sound recordings.[14]  (Ex. H to Yoo

19    Decl. at p. 3/13).

20 •    In June 2010, CJ E&M sub-licensed those international distribution rights for
     one year (*i.e.,* until June 2011) to DFSB.  *Id.*

21

22 •    In fact, YG Entertainment had only licensed distribution rights to CJ E&M
     until April 2011.  *Id.* at 5/13.  CJ E&M had therefore sub-licensed rights to

23    DFSB for two months (May 2011 and June 2011) for which CJ E&M did not

24 [13] Defendants claim that "[u]nder Korean contract law, a transfer of a copyright does
not have to be in writing" (Defs'. Memo. at 14:6-7) is a red herring since—as

25 defendants acknowledge—the parties claim to have obtained their copyrights in
writing. *See* Defs'. Memo. at 14:21-15:9; 16:27-17:19.

26 [14] None of those sound recordings are at issue in this case in Los Angeles.  (Cho

27 Decl. ¶ 6)  No one has claimed that YG Entertainment possesses information relevant
to this case in Los Angeles.

28

have the rights. *Id.* This violated CJ E&M's representation in the sub-licensing agreement that it had distribution rights through June 2011. *Id.*

**Breach of Contract against CJ E&M for Issuing Duplicate International Standard Recording Codes.**

- In 2010, CJ E&M issued an improper ISRC code for songs by the artists T.O.P. and Taeyang distributed, which was relevant to DFSB's business in Japan.[15] (Ex. H to Yoo Decl. at p. 6/13) This violated the sub-licensing agreement between DFSB and CJ E&M, which required the latter to obtain the necessary documentation for the sound recordings. *Id.* at 7/13.

**Breach of Contract against CJ E&M for Failing to Take Action Against Illegal Downloads.**

- In 2010, CJ E&M refused to cooperate with DFSB to remove music from YG Entertainment that had been illegally uploaded by music pirates to third-party websites.[16] *Id.* at 8/13. DFSB alleged that CJ E&M's lack of cooperation in shutting down music pirates violated the sub-licensing agreement between DFSB and CJ E&M, which required a certain level of cooperation between the parties. *Id.*

**Breach of Contract against CJ E&M for Defamation of DFSB**

- In 2010, CJ E&M incorrectly informed Apple iTunes that DFSB did not have the rights to distribute YG Entertainment's music—even though CJ E&M had sub-licensed these rights to DFSB. *Id.* at 9/13. This violated the sub-licensing agreement between DFSB and CJ E&M, which prohibited defamation. *Id.*

**Breach of Contract against CJ E&M for Illegal Overseas Distribution**

- In 2010, CJ E&M distributed 3,947 songs (including the songs at issue in this Los Angeles action) outside of Korea via www.mnet.com and music.naver.com. *Id.* at 11/13. CJ E&M did not use proper ISRC codes. *Id.* This violated the sub-licensing agreement between CJ E&M and DFSB because the songs distributed by CJ E&M included the sound recordings from YG Entertainment. *Id.*

\*\*\*

In August 2012, DFSB and CJ E&M settled certain of the claims as follows:

Defendant shall pay 50,000,000 KRW as compensation for damages to

---

[15] This artist's songs are not at issue in this case. *See* Ex. 1 to Complaint (listing artists at issue in this case).

[16] None of this music is at issue in this case. (Cho Decl. ¶ 6)

the plaintiff by September 30, 2012 for the following reasons:
(1) issuing duplicate International Standard Recording Code (ISRC) for
the YG digital music content that the plaintiff held overseas distributor
rights to, and (2) reporting the YG digital music content that was
legitimately distributed by the plaintiff through Apple iTunes as illegal
music contents.

(Ex. H to Yoo Decl. at 1/13)  It was further agreed that: "Plaintiff shall withdraw

remaining claims and both plaintiff and defendant shall not submit any other

civil claims such as compensation for damages etc. in relation to the agreement of

this case." *Id.* at 2/13.

For multiple reasons, this settlement order does not foreclose the current action

in Los Angeles:

*First*, the current action involves conduct that post-dates the conduct at issue in

the Korean litigation.  DFSB's complaint in Korea, which was filed in 2011,

necessarily involved actions earlier than that date.  In contrast, the current action,

which was filed in March 2015, involves conduct after March 2012 in light of the

three-year statute of limitations under the Copyright Act (17 U.S.C. § 507(b)).

Defendants' distribution of music via Beats could not have been at issue in 2011

because Beats was not launched until 2014.  *See* Ex. 2 to Gottfried Decl. at 54:21-23.

Nor was defendants' distribution of music via mnet.com since March 2012 at issue in

a Complaint that was filed in 2011.  In fact, in arguing that mnet.com is not available

in the United States, defendants have emphasized technological measures after

March 2012.  (Ex. 22 to Gottfried Decl. at Response to Rog. No. 2) (stating that

"persons located in the US have not been able to purchase music content from the

Mnet.com website at any point after March 6, 2012"); *id.* (describing certain geo-

blocking  on browsers between January 2014 and July 2015).  Defendants have

further suggested that—after a 2011 investigation by the Korean government

criticizing their illegal international distribution of music—they implemented

technological measures designed to block international access.  (Ex. 2 to Gottfried

Decl. at 38:21-39:11) ("Q:…[W]as the redirecting of the mnet.com website related to

-18-

1   the 2011 Korean audit of CJ Korea? A:…I assumed that was the case.").

2   Consequently, plaintiff could not have released claims in 2012 for acts that had yet to

3   occur.

4        *Second*, there was no mention of copyright infringement in the Korean

5   litigation.

6        *Third*, there was no mention of the United States or unlawful distribution

7   specifically in this country.

8        *Fourth,* as this Court previously concluded when denying defendants' prior

9   motion to dismiss, "Defendants did not refute Plaintiff's argument that it derived its

10  purportedly infringed licenses directly from the copyright owners rather than as a

11  result of the contract underlying the prior Korean litigation." (Dkt. No. 24 at p.5)

12       *Fifth*, the parties agreed in the Korean settlement not to bring other claims "in

13  relation to the agreement of this case." As explained above, the Korean litigation

14  focused on breach of a sub-licensing agreement between CJ E&M and DFSB that

15  expired in 2011 for music from YG Entertainment.[17]   CJ E&M agreed to pay DFSB

16  only for: "(1) issuing duplicate International Standard Recording Code (ISRC) for

17  the YG digital music content that the plaintiff held overseas distributor rights to, and

18  (2) reporting the YG digital music content that was legitimately distributed by the

19  plaintiff through Apple iTunes as illegal music contents." (Ex. H to Yoo Decl. at

20  1/13)  Plaintiff agreed not to file "any other claims such as compensation for

21  damages etc. in relation to the agreement of this case." *Id.*   Claims not covered by

22  the agreement (*i.e.,* claims not involving the issuance of duplicate ISRCs for YG

23  digital music content or involving the reporting of YG digital music content on

24  iTunes) were not resolved—they were only withdrawn.

25

26  [17] That sub-licensing agreement is not at issue here.  DFSB obtained exclusive distri-
bution rights within the United States directly from the musicians or their

27  management companies.  (Ex. A to Cho Decl. & Cho Decl. ¶ 3)   Furthermore, none
of the music from YG Entertainment is at issue here. *See* Ex. 1 to Complaint.

28

1  Defendants nonetheless claim that the release is ambiguous.  (Defs.' Memo. at
2  21:12-22:4)  Not so.  But the Court need not resolve that question.  Defendants do
3  not claim—and they cannot plausibly claim—that the 2012 Settlement Order
4  absolved defendants of any future wrongdoing.  There is no language to this effect.
5  Even if the 2012 Settlement Order had released all claims regarding defendants'
6  unlawful distribution, this would not have preclusive effect on new violations in
7  2013, 2014 and 2015.  *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962,
8  1969 (2014)  ("Each time an infringing work is reproduced or distributed, the
9  infringer commits a new wrong.   Each wrong gives rise to a discrete claim that
10  accrues at the time the wrong occurs." ((internal quotation marks and brackets
11  omitted)).

c.   **The Forum's Convenience to the Litigants Does Not Favor Dismissal.**

12
13
14  By virtue of the fact that DFSB filed suit in this forum, it is convenient for
15  DFSB.  This forum is also convenient for CJ E&M America, which is based in Los
16  Angeles.  While Korea may be a more convenient forum for CJ E&M, two out of
17  three of the litigants have no reasonable objection to the convenience of this forum.

d.   **Access to Physical Evidence and Other Sources of Proof Does Not Favor Dismissal.**

18
19
20  As this Court previously concluded when denying defendants' prior motion to
21  dismiss, it "appears that this action will involve at least some witnesses and docu-
22  ments from Korea and some from the United States.  Finally, it also appears that
23  some evidence will be in English and some will be in Korean.  Thus, these conflict-
24  ing considerations largely cancel each other out."  (Dkt. No. 24 at p. 4)  Nothing that
25  defendants argue changes this conclusion.   The parties in Korea and the United
26  States have produced over 12,000 pages in discovery (including computer code)
27  without difficulty.  *See Nat'l Shopmen Pension Fund, v. Stamford Iron & Steel*
28  *Works, Inc.*, 999 F. Supp. 2d 229, 233 (D.D.C. 2013) ("[T]he location of documents

-20-

1   is increasingly irrelevant in the age of electronic discovery, when thousands of pages

2   of documents can be easily digitized and transported to any appropriate forum.").

3   While defendants claim that their payment processing database must be reviewed in

4   Korea (Defs.' Memo. at 13:8-17), that is largely a condition of defendants' own crea-

5   tion:  there is no reason why a third party could not remotely review that database

6   from the United States.[18]   In the end—and as the Court previously concluded—the

7   existence of evidence in the United States and Korea cancel each other out.

8                    **e.        Whether Unwilling Witnesses Can Be Compelled to**
                                 **Testify Does Not Favor Dismissal.**
9

10          Defendants argue that there are relevant, non-party witnesses in Korea whose

11  testimony could not be compelled in this action.[19]   (Defs.' Memo. at 16:4-7)  That is

12  wrong.  As stated by a senior Korean lawyer in the attached declaration:

13          Korea does permit the taking of depositions of Korean citizens in Korea
            pursuant to Letters of Request properly issued under the Hague
14          Convention….Moreover, Korean courts have the authority to order
            witnesses to appear for examination at trial pursuant to Article 310 of
15          the Civil Procedure Act….Therefore, at least after a trial begins in the
            United States, it is possible to have a Korean court compel a witness to
16          testify under oath about a particular matter and it may be permissible to
            compel a witness to testify prior to trial under the court's authority to
17          enforce treaties.

18  Supplemental Declaration of Seung-Gon Jo ¶ 3.

19          Defendants chose not to make any effort to pursue Letters of Request or to

20  seek to compel the testimony of witnesses in Korea.  Similarly, in April 2015,

21  defendants claimed that they may need to implead Neowiz Internet (Dkt. No. 13 at

22  12:11-19); but defendants made no efforts to do so in the subsequent eight months.

23  _____

    [18] Defendants also attempt to manufacture another problem: access to a "NEOLIP"
24  database.  They argue that the case must be transferred to Korea because "while
    [they] can access NEOLIP in Korea, that database is not in the parties' control."
25  (Defs.' Memo.a t 17:14-15)  Given defendants' ability to access the database, it is
    unclear what the discovery problem is.
26  [19] Defendants claim only that one of these witnesses—Mr. Lee—was unwilling to
    testify voluntarily.  (Defs.' Memo at 16:4)  They do not claim that the other
27  witness—Mr. Yang—was unwilling to testify.  They do not describe any efforts that
    they made to obtain Mr. Yang's live testimony.
28

-21-

1  Regardless of whether it may be inconvenient to follow the procedure in the Hague
2  Convention, a party's failure to pursue those procedure does not justify dismissal.
3  *See Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.,* 940 F. Supp. 554, 564 (S.D.N.Y.
4  1996) ("KPMG argues that the uncertainty and expense of using letters rogatory
5  under the Hague Convention, 28 U.S.C. § 1781 note, to compel witnesses and
6  documents would render proceeding in New York inefficient.  While proceeding
7  under the Hague Convention is more time-consuming than compelling witnesses
8  subject to process under the Federal Rules of Civil Procedure in the United States,
9  [this] burden does not reach the requisite level of oppressiveness or vexatiousness"
10  for dismissal under *forum non conveniens*).

11          **f.      The Cost of Bringing Witnesses to Trial Does Not Favor
12                   Dismissal.**

13          If witnesses from CJ E&M were to testify at trial in person, they would travel
14  from Korea to California.  But trans-Pacific travel is inevitable in this case.  If DFSB
15  filed its case in Korea, then witnesses from CJ E&M America would have to travel
16  from California to Korea.  Consequently, it is unlikely that filing this suit in Korea
17  will save costs on witness travel relative to maintaining this lawsuit in California.

18          Furthermore, if this case remains in the United States, then witnesses can be
19  deposed and "the physical location of witnesses is less important when testimony
20  may be taken by deposition (including by deposition *de bene esse*) and presented to
21  the Court at either the summary judgment stage or a trial.  Witnesses may also testify
22  in this Court at trial via live videoconference." *Nat'l Shopmen Pension Fund*, 999 F.
23  Supp. 2d at 233.  *See also* L.R. 83-6.3.2 (allowing video-recorded testimony to be
24  used at trial).

25          **g.      The Enforceability of the Judgment Does Not Favor
26                   Dismissal.**

27          Any judgment against CJ E&M rendered by this Court will be enforceable in
28  Korea. (First Jo Decl. (Dkt. No. 14-2) ¶ 11)  *See also In re Sik Choi v. Hyung Soo*

-22-

1 │ *Kim*, 50 F.3d 244, 248 (3d Cir. 1995); *Samyang Food Co. v. Pneumatic Scale Corp.*,

2 │ No. 5:05-CV-636, 2005 WL 2711526, at *11 (N.D. Ohio Oct. 21, 2005).  Defendants

3 │ do not argue otherwise.

4 │       **h.**     **An Efficient Resolution of This Dispute Does Not Favor**

5 │                 **Dismissal.**

6 │      Given that this case will shortly be tried after almost a year of discovery, it is

7 │ inefficient to transfer it to Korea for the parties to begin again.

8 │      In arguing that this case should be dismissed, defendants claim that the amount

9 │ in controversy is *de minimis*.  (Defs.' Memo. at 1:5)  But defendants have made it

10 │ difficult to determine the number of downloads from the United States of the songs

11 │ at issue.  For example, defendants assert that "Korean privacy laws prevent CJ E&M

12 │ Corporation from being able to produce…personal identifying

13 │ information…contained in its payment database."  (Defs.' Memo. at 6:26-28)   Given

14 │ that personally identifying information includes addresses, this makes it difficult for

15 │ plaintiff to determine where the payments for songs at issue originated.  Furthermore,

16 │ with respect to identifying the location of members of mnet.com, defendants claim

17 │ that "physical addresses of mnet.com subscribers/users are no longer requested or

18 │ kept."  (Ex. 1 to Gottfried Decl. at Response to Rog. No. 7)  Given the difficulties

19 │ created by defendants in determining their profits from infringement, plaintiff is

20 │ seeking statutory damages.  *See F. W. Woolworth Co. v. Contemporary Arts*, 344

21 │ U.S. 228, 231 (1952) (statutory damages are intended to allow "owner of a copyright

22 │ some recompense for injury done to him, in a case where the rules of law render

23 │ difficult or impossible proof of damages or discovery of profits").   These statutory

24 │ damages are sizable, with maximum, non-willful infringement amounting to over

25 │ $10 million.

26 │       **3.**     **The Public Interest Factors Do Not Favor Dismissal.**

27 │           **a.**     **The Local Interest in the Lawsuit Does Not Favor**

28 │                  **Dismissal.**

This factor is satisfied because—as discussed above—this case concerns distribution of sound recordings to consumers via a California-based music service (Beats) and a website accessible to American consumers (including in this state) by two defendants, one of whom is a Los-Angeles-based company.   Furthermore, the plaintiff does not distribute the music at issue within Korea.  (Cho Decl. ¶ 1)  Its primary market is the United States where its principal business partners are in California.  *Id.*  Nor is there any suggestion that defendants were prohibited from distributing the music at issue within Korea.

### b. The Court's Familiarity with the Governing Law Does Not Favor Dismissal.

As this Court previously observed when denying defendants' prior motion to dismiss, "[i]t appears that regardless of where the case is tried, this litigation will require application of both Korean law (as to copyright ownership) and U.S. law (as to infringement)….[T]hese conflicting considerations largely cancel each other out." (Dkt. No. 24 at p. 4)  That remains true.  Issues that must be decided under American law include:  (1) whether International Standard Recording Codes are copyright management information under 17 U.S.C. § 1202(a); (2) whether Universal Product Codes are copyright management information under 17 U.S.C. § 1202(a); (3) whether defendants' conduct satisfied the knowledge and intent requirements under 17 U.S.C. § 1202; and (4) whether defendants' online distribution of sound recordings over mnet.com, despite their alleged technological obstacles, constituted infringement under 17 U.S.C. § 501.  Defendants acknowledged the importance of American law in their prior motion to dismiss.  *See* Dkt. No. 13 at 13:26-28 ("[T]he issue of whether the work was infringed is often governed by the laws of the country in which the alleged infringement occurred.")  Issues that may be decided under Korean law include the resolution of ownership to the distribution rights of 12% (36 out of 303) of the sound recordings.  Consequently, the mix of American and Korean law (with American law predominating) does not favor dismissal.

   **c.**  **The Burden on Local Courts and Juries Does Not Favor Dismissal.**

   As discussed in connection with the first public-interest factor, California has a substantial connection to this case.  Consequently, there would not be an unfair burden on local juries.

   **d.**  **Congestion in the Court Does Not Favor Dismissal.**

   "With respect to congestion, the issue is not whether dismissal will reduce congestion in California, but whether a trial will be quicker in [the alternative forum] because its docket is less crowded." *King.com Ltd. v. 6 Waves LLC*, No. C-13-3977 MMC, 2014 WL 1340574, at *9 (N.D. Cal. Mar. 31, 2014) (internal quotation marks omitted).  Given that trial in this country is scheduled in approximately one month from this hearing, it is difficult to imagine that there would be a faster resolution in Korea.

   **e.**  **The Costs of Resolving a Dispute Unrelated to a Particular Forum Does Not Favor Dismissal.**

   As discussed above, this action is related to this forum.

**IV. CONCLUSION**

   The Court should deny defendant's motion to dismiss.

Dated:  January 4, 2016     BROWNE GEORGE ROSS LLP
                Eric M. George
                Jonathan Gottfried

                By   /s/ Jonathan Gottfried
                   Jonathan Gottfried
                Attorneys for Plaintiff
                DFSB Kollective Co., Ltd.